## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| UPH HOLDINGS, INC. | § | CASE NO. 13-10570 |
| PAC-WEST TELECOMM, INC. | § | CASE NO. 13-10571 |
| TEX-LINK COMMUNICATIONS, INC. | § | CASE NO. 13-10572 |
| UNIPOINT HOLDINGS, INC. | § | CASE NO. 13-10573 |
| UNIPOINT ENHANCED SERVICES, | § | CASE NO. 13-10574 |
| INC. | § | |
| UNIPOINT SERVICES, INC. | § | CASE NO. 13-10575 |
| NWIRE, LLC | § | CASE NO. 13-10576 |
| PEERING PARTNERS | § | CASE NO. 13-10577 |
| COMMUNICATIONS, LLC | § | |
| | § | |
| DEBTORS. | § | CHAPTER 11 |
| | § | |
| EIN: 45-1144038; 68-0383568; 74- | § | |
| 2729541;  20-3399903; 74-3023729; 38- | § | |
| 3659257; 37-1441383; 27-2200110; 27- | § | |
| 4254637 | § | |
| | § | |
| 6500 RIVER PL. BLVD., BLDG. 2, # 200 | § | JOINTLY ADMINISTERED UNDER |
| AUSTIN, TEXAS 78730 | § | CASE NO. 13-10570 |

## NOTICE OF STALKING HORSE BIDDER

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (herein "Debtors") hereby provide notice that the Debtors in consultation with the Official Committee of Unsecured Creditors and Hercules Technology II, L.P., have selected TNCI Operating Company, LLC as the Stalking Horse Bidder.  A clean and blacklined Asset Purchase Agreement is attached hereto.

Dated: July 5, 2013.

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - FAX


By: /s/ *Patricia B. Tomasco*
    Patricia B. Tomasco
    State Bar No. 01797600
    (512) 236-2076 – Direct Phone
    (512) 691-4438 – Direct Fax
    Email address: ptomasco@jw.com

    Jennifer F. Wertz
    State Bar No. 24072822
    (512) 236-2247 – Direct Phone
    (512) 391-2147 – Direct Fax
    Email address: jwertz@jw.com

**COUNSEL FOR DEBTORS-IN-POSSESSION**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of July 2013, a true and correct copy of the foregoing was served via the Court's CM/ECF electronic notification system on all parties requesting same, and via US first class mail, post prepaid to the parties listed below, and on the attached service list.

UPH Holdings, Inc.
Pac-West Telecomm, Inc.
Tex-Link Communications, Inc.
UniPoint Holdings, Inc.
UniPoint Enhanced Services, Inc.
UniPoint Services, Inc.
nWire, LLC
Peering Partners Communications, Inc.
6500 River Place Blvd., Bldg. 2, Suite 200
Austin, Texas 78730

Valerie Wenger
Office of the United States Trustee
903 San Jacinto, Room 230
Austin, TX  78701

Stuart Komrower
Ilana Volkov
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
25 Main Street
Hackensack, New Jersey 07601

/s/ *Patricia B. Tomasco*
Patricia B. Tomasco

Steve Hubbard / RBC
202 US Route One, Suite 206
Falmouth, ME  04105

One Communications/Earthlink
5 Wall Street
Burlington, MA 01803

America OnLine
22000 AOL Way
Dulles, VA 20166

Telesense
Cabs Department
P.O. Box 364300
Las Vegas, NV  89133-6430

Cox Communications
1550 W. Deer Valley Rd.
Phoenix AZ 85027

CenturyLink
P.O. Box 2961
Phoenix, AZ  85062-2961

Frontier
P.O. Box 92713
Rochester, NY  14692-0000

Cogent Communications
P.O. Box 791087
Baltimore, MD  21279-1087

Genband, Inc.
ATTN: Eric Hinton
2801 Network Blvd
Suite 300
Frisco, TX  75034

Samsara
1250 S Capital of Texas Highway
Bldg 2-235
West Lake Hills, TX  78746

La Arcata Development Limited
ATTN: ACCOUNTS RECEIVABLE
c/o NAI Reco Partners
1826 N. Loop 1604 W, #250
San Antonio, TX  78248

Grande Communications Network
Dept 1204
P.O. Box 121204
Dallas, TX  75312-1204

Telus Corporation
215 Slater Street
Ottawa, Ontario, K1P 5N5
CANADA

Alpheus Communication
Attn:  SVP – Contract
Administration
1301 Fannin, 20th Floor
Houston, TX  77002

Hines REIT One Wilshire, LP
Attn: Kevin McInerny
624 S. Grand Avenue
Suite 2435
Los Angeles, CA 90017

Bandwidth.Com, Inc.
75 Remittance Drive, Suite 6647
Chicago, IL  60675

Pac Bell
P.O. Box 166490
Atlanta, GA  30321-0649

Arent Fox LLP
1050 Connecticut Ave. N.W.
Washington, DC  20036-5339

FPL FiberNet LLC
TJ412-01-0-R
ATTN:  FISCAL SERVICES
2540 Shumard Oak Boulevard
Tallahassee, FL  32399-0850

Pilot Communications
P.O. Box 77766
Stockton, CA  95267-1066

Arthur A. Stewart
William A. Frazell
Assistant Attorneys General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, Texas 78711-2548

Stuart Komrower
Ilana Volkov
COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.
25 Main Street
Hackensack, New Jersey 07601

Valerie Wenger
US Trustee
903 San Jacinto Blvd., room 230
Austin, Texas 78701

Internal Revenue Service
P. O. Box 7346
Philadelphia, PA 19101-7346

United States Attorney
816 Congress Avenue, Suite 1000
Austin, TX 78701

United States Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Texas Comptroller of Public Accounts
Revenue Accounting Division –
Bankruptcy Section
P.O. Box 13528
Austin, TX 78711

Texas Workforce Commission
TEC Building – Bankruptcy
101 East 15th Street
Austin, TX 78778

James Ruiz
Andrew J. Schumaker
Winstead P.C.
401 Congress Avenue, Suite 2100
Austin, Texas 78701

UPH Holdings, Inc./Pac-West Telecomm, Inc./Tex-
Link Communications, Inc./UniPoint Holdings, Inc.
UniPoint Enhanced Services, Inc./UniPoint Services,
Inc./nWire, LLC
Peering Partners Communications, Inc.
6500 River Place Blvd., Bldg. 2, Suite 200
Austin, Texas 78730

A. Kenneth Hennesay
**ALLEN MATKINS**
1900 Main Street, 5th Floor
Irvine, CA 92614-7321

Mitchell W. Katz
1801 California Street, 9th Floor
Denver, CO  80202

Timothy Bortz
Commonwealth of Pennsylvania
Dept. of Labor and Industry
Reading Bankruptcy & Compliance Unit
625 Cherry Street, Room 203
Reading, PA 19602-1152

John Dillman
Attorney in Charge for Taxing Authority
Linebarger Goggan Blair & Sampson, LLP
PO Box 3064
Houston, Texas  77253-3064

Joseph R. Dunn
Mintz Levin Cohn Ferris Glovsky and
Popeo, PC
3580 Carmel Mountain Rd., Suite 300
San Diego, CA 92130

Dun & Bradstreet
c/o Ronald Rowland
307 International Circle, Ste 270
Hunt Valley, MD 21030

Elizabeth Weller
LINEBARGER GOGGAN BLAIR &
SAMPSON, LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201

Hercules Technology II, LP
31 St. James Avenue, Suite 790
Boston, MA  02116

Kelly M. Crawford, Esq.
Peter C. Lewis, Esq.
Scheef & Stone, L.L.P.
500 N. Akard, 27th floor
Dallas, Texas 75201

Melissa A. Haselden
HOOVER SLOVACEK LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057

David F. Brown
Ewell, Bickham, & Brown LLP
111 Congress Avenue, Suite 400
Austin, Texas 78701

Philip G. Eisenberg
W. Steven Bryant
Locke Lord LLP
600 Travis Street, Suite 2800
Houston, Texas 77702

IBM Corporation
Bankruptcy Coordinator
Roger Laviolette
275 Viger East, Suite 400
Montreal, QC H2X 3R7
Canada

Kate P. Foley
Christine E. Devine
Mirick O'Connell, DeMallie & Lougee
1800 West Park Drive, Suite 400
Westborough, MA 01581

Courtney Harris
Aldine ISD
14910 Aldine-Westfield Rd.
Houston, Texas 77032

James V. Hoeffner
GRAVES, DOUGHERTY, HEARON
MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701

Hercules Technology Growth
Capital, Inc.,
31 St. James Avenue, Suite 790
Boston, MA  02116

Jason S. Brookner
**LOOPER REED & MCGRAW
P.C.**
1601 Elm Street, Suite 4600
Dallas, TX 75201

Kurt F. Gwynne
Reed Smith
1201 N Market Street, Suite 1500
Wilmington, DE 19801

Linda Boyle, Esq.
tw telecom inc.
10475 Park Meadows Drive, # 400
Littleton, CO 80124

Craig A. Wolfe, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Richard E. Mikels
Mintz Levin Cohn Ferris Glovsky
and Popeo, PC
One Financial Center
Boston, MA 02111

Kay D. Brock
Travis County Attorney's Office
PO Box 1748
Austin, Texas 78767-1748

David Aelvoet
Linebarger Goggan Blair &
Sampson
711 Navarro Street, Suite 300
San Antonio, Texas 78205

9111310v.1

Laura Garfinkel
CABS Billing Division
GSAssociates
5400 Laurel Springs Parkway, Suite 404
Suwanee, GA 30024

BOXER F2, LP
c/o Tracy Fink
720 N Post Oak Blvd., Suite 500
Houston, Texas 77024

Leslie E. Trout
Director of Finance and Administration
ATER WYNNE LLP
1331 NW Lovejoy Street, Suite 900
Portland, OR 97209

Stephen W. Lemmon
Sam Chang
Brown McCarroll, LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701

Charles E. Richardson, III, Esq.
Vice President and General Counsel
Momentum Telecom
2700 Corporate Drive, Suite 200
Birmingham, AL 35242

Darryl S. Laddin
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363-1031

Frank N. White
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363-1031

**Execution Copy**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**UPH HOLDINGS, INC.,**
**PAC-WEST TELECOMM, INC.,**
**TEX-LINK COMMUNICATIONS, INC.,**
**UNIPOINT HOLDINGS, INC.,**
**UNIPOINT ENHANCED SERVICES, INC.,**
**UNIPOINT SERVICES, INC.,**
**NWIRE, LLC,**
**PEERING PARTNERS COMMUNICATIONS, LLC,**

**AND**

**TNCI OPERATING COMPANY LLC**

**JULY ___, 2013**

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE 1 | PURCHASE AND SALE OF ASSETS | 1 |
| 1.1 | Description of Assets | 1 |
| 1.2 | Excluded Assets | 4 |
| 1.3 | Purchase Price | 5 |
| 1.4 | Earnest Money | 6 |
| ARTICLE 2 | ASSUMPTION OF LIABILITIES | 7 |
| 2.1 | Liabilities Assumed | 7 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF SELLERS | 8 |
| 3.1 | Status | 8 |
| 3.2 | Taxes | 10 |
| 3.3 | Personal Property; Title to Assets | 10 |
| 3.4 | Intellectual Property Rights | 12 |
| 3.5 | Litigation; Insurance | 13 |
| 3.6 | Accounts Receivable | 13 |
| 3.7 | Financial Statements | 13 |
| 3.8 | Deposits and Prepayments | 13 |
| 3.9 | FCC and State PUC Authorizations | 13 |
| 3.10 | Leases | 14 |
| 3.11 | Employment Matters; Employee Benefits | 15 |
| 3.12 | Compliance with Laws | 15 |
| 3.13 | Brokers, Finders, etc. | 15 |
| 3.14 | Books and Records | 15 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF BUYER | 16 |
| 4.1 | Status of Buyer | 16 |
| 4.2 | Brokers, Finders, etc. | 17 |
| 4.3 | Purchase Price | 17 |
| ARTICLE 5 | CLOSING AND CLOSING DATE | 17 |
| ARTICLE 6 | COVENANTS OF SELLER | 21 |
| 6.1 | Conduct of Business by Seller Pending the Closing | 21 |
| 6.2 | Affirmative Covenants | 21 |
| 6.3 | Consents and Closing Conditions | 22 |
| 6.4 | Bankruptcy Court Approvals | 22 |
| ARTICLE 7 | COVENANTS OF BUYER | 23 |
| 7.1 | Consents and Closing Conditions | 23 |
| 7.2 | Access to Records | 24 |
| 7.3 | Claims Retained by Sellers | 24 |

i

ARTICLE 8          TAX MATTERS ...................................................................................24
    8.1         Cooperation and Records Retention.........................................................24
    8.2         Tax Elections and Permits........................................................................24
    8.3         Sales and Transfer Taxes..........................................................................24
    8.4         Property Taxes..........................................................................................24

ARTICLE 9          BUYER'S CONDITIONS TO CLOSING..................................................25
    9.1          ...................................................................................................................25
    9.2         Accuracy of Representations and Warranties ...........................................25
    9.3         Performance of Covenants .......................................................................25
    9.4         Closing Documents ..................................................................................25
    9.5         No Changes ..............................................................................................25
    9.6         Approval of Bankruptcy Court.................................................................25

ARTICLE 10        SELLER'S CONDITIONS TO CLOSING ...............................................26
    10.1       Accuracy of Representations and Warranties ...........................................26
    10.2       Performance of Covenants .......................................................................26
    10.3       Closing Documents ..................................................................................26
    10.4       Approval of Bankruptcy Court.................................................................26

ARTICLE 11        TERMINATION OF AGREEMENT ......................................................26
    11.1       Termination ..............................................................................................26
    11.2       Effect of Termination ...............................................................................27

ARTICLE 12        MISCELLANEOUS.................................................................................28
    12.1       Notices.....................................................................................................28
    12.2       Amendment ..............................................................................................28
    12.3       Counterparts ............................................................................................28
    12.4       Binding on Successors and Assigns.........................................................29
    12.5       Severability..............................................................................................29
    12.6       Publicity ..................................................................................................29
    12.7       Headings..................................................................................................29
    12.8       Expenses..................................................................................................29
    12.9       Waivers....................................................................................................29
    12.10     Entire Agreement; Law Governing ..........................................................29

EXHIBITA –MANAGEMENT SERVICES AGREEMENT

49066/0006-9679207v2

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of July, 2013 by and among TNCI Operating Company LLC, a Delaware limited liability company, or its assigns ("**Buyer**"), and UPH Holdings, Inc., a Delaware corporation and debtor-in-possession ("**UPH**") Pac-West Telecomm, Inc., a Delaware corporation and debtor-in-possession ("*Pac-West*"), UniPoint Holdings, Inc., a Delaware corporation and debtor in possession ("**UniPoint Holdings**"), nWire, LLC, a Texas limited liability company and debtor in possession ("*nWire*"), Peering Partners Communications Holdings, LLC, a Texas limited liability company and debtor in possession ("*Peering Partners*"), UniPoint Services, Inc., a Texas corporation and debtor in possession ("**UniPoint Services**"), UniPoint Enhanced Services, Inc., a Texas corporation and debtor in possession ("**UniPoint Enhanced**"), and Tex-Link Communications, a Delaware corporation and debtor in possession ("**Tex-Link**"), (collectively, "**Sellers**").

RECITALS

WHEREAS, Sellers are engaged in the provision of telecommunications and database services (the "**Business**"); and

WHEREAS, on March 28, 2013 (the "**Petition Date**"), Sellers filed voluntary petitions for relief commencing cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("**Bankruptcy Court**"); and

WHEREAS, Buyer and Sellers have reached an understanding pursuant to which Buyer shall acquire the Assets (as defined in Section 1.1), which represent substantially all of the assets of the Business other than the Excluded Assets (as defined in Section 1.1), subject to the terms and conditions of this Agreement; and

WHEREAS, each party hereto desires to set forth certain representations and covenants, and to establish certain closing conditions, made to induce the other to execute and deliver this Agreement and to consummate the transactions contemplated hereby, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the premises, the covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1    Description of Assets.  On each relevant Closing Date (as each term is defined in Article 5 hereof), subject to the terms and conditions set forth in this Agreement, Sellers shall sell, convey, transfer and assign to Buyer, and Buyer shall purchase and accept from Sellers, any and all right, title and interest in and to all of Seller's tangible and intangible assets

of the Business, including but not limited to, those assets set forth below and in <u>Schedule 1.1</u> (the "***Assets***"; <u>provided</u>, that the Assets will not include the assets described in <u>Section 1.2</u> below (the "***Excluded Assets***")), free and clear of all Encumbrances (as defined below), other than liens for the payment of Taxes not yet due or payable, and leases, licenses and other encumbrances set forth on <u>Schedule 1.1</u> (the "***Permitted Encumbrances***"), and of all interests in property as set forth in Section 363 or other portions of the Bankruptcy Code:

   (a) prepaid expenses, deferred charges, advance payments and security deposits of Sellers <u>that solely relate to the Business;</u>

   (b) all machinery, equipment, vehicles, furniture, fixtures, signs, supplies, accessories, spare parts, tools and other items of tangible personal property owned by Sellers and used solely in the Business, with all assignable executory contracts, licenses, leases, warranty rights and operating manuals and keys relating thereto, all as set forth on <u>Schedule 1.1(b)</u>;

   (c) except to the extent they fall within the Excluded Assets, Sellers' websites, internet domain <u>names used by the </u>Business, including, to the extent assignable, all rights with respect to internet service providers, third party linking sites and all rights of Seller to owned and/or licensed proprietary, customized and mass market computer software and all computer hardware appropriate for the continued operation of the Business ("***Domain Rights***"), all as set forth on <u>Schedule 1.1(c)</u>;

   (d) except to the extent they are Excluded Assets: all of Sellers' trademarks, service marks, trade dress, trade names and corporate names and signage, and all the goodwill associated therewith; all of Sellers' registered and unregistered statutory and common law copyrights; all registrations, applications, renewals or common law rights for any of the foregoing; all of Sellers' trade secrets, confidential information, ideas, formulas (whether developed or under development), know-how, manufacturing and production processes and techniques, research information, specifications, designs, plans, improvements, proposals, technical and computer data, to the extent transferable, all of Sellers' license rights with respect to intellectual property of third parties; to the extent transferable, all of Sellers' rights under all confidentiality agreements, non-disclosure agreements, invention assignment agreements and similar agreements executed between Sellers and any employee, consultant or agent of Sellers or any other third party with respect to any intellectual property right of Sellers described in this <u>Section 1.1(d)</u> (together with the Domain Rights, the "***Intellectual Property Rights***");

   (e) subject to <u>Section 2.1</u>, all of Sellers' rights under each of the contracts listed on <u>Schedule 1.1(e)</u>, which will be delivered and finalized pursuant to <u>Section 2.1</u> (the "***Assigned Contracts***"), including any Accounts Receivable and Unbilled Revenue Associated therewith;

   (f) all Accounts Receivable, Unbilled Revenue and other receivables, as of the Initial Closing Date and arising on or after the Petition Date, and any Accounts Receivable and Unbilled Revenue generated by Sellers under any Assigned Contract (collectively the "Acquired Accounts Receivable");

(g)      all Customer Accounts; <u>provided, however</u>, that the final listing of Customer Accounts and Assigned Contracts with respect to Customer Accounts shall be set forth by Sellers in the appropriate instrument of conveyance delivered at the relevant Closing;

(h)      revenue from Sellers' Customer Accounts that accrues after the Initial Closing, subject to and in accordance with the Management Services Agreement;

(i)      a list of all Cancelled Accounts, if any;

(j)      to the extent used solely in the Business, Sellers' mailing lists, customer lists, brochures and related sales materials and all ad copy, photography and artwork, including materials and documents relating to services, marketing, advertising, promotional activities, trade shows, and all files, supplier lists, records, literature and correspondence (but excluding (i) personnel files for employees of Seller, (ii) such files as may be required to be withheld under applicable law regarding privacy, and (iii) any documents that are not relevant to the Assets), and copies of any and all information and records related to the Customer Accounts that are captured in Sellers' operating support systems in electronic format, and all other documents and materials wherever located that are used in, held for use in or intended to be used in, or that arise out of or relate to, the Business or the Assets;

(k)      to the extent assignable, Sellers' telephone numbers (for both voice and data transmission), and used in the Business other than those listed as Excluded Assets;

(l)      all records and files pertaining solely to the Business, customers and suppliers, including, without limitation, all supplier, vendor, customer and agency lists, all sales data, correspondence with customers, customer files and account histories, and records of purchases from and correspondence with suppliers, but not including the corporate minute books of Sellers;

(m)      Sellers' Operating Company Numbers, Access Customer Name Abbreviations and Carrier Identification Codes;

(n)      to the extent transfer is permitted under the Bankruptcy Code or other applicable law, all permits, licenses, certificates, variances, exemptions, orders, approvals, tariffs, rate schedules and similar documents from any Governmental Body (collectively, "**_Licenses_**") necessary for the lawful ownership of the Assets or other lawful conduct of the business as currently conducted;

(o)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the seller or with third parties to the extent relating to the Assets, including, without limitation, the Customer Accounts, but excluding any employment agreements containing any such agreements;

(p)      all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Assets (including, for the avoidance of doubt, those arising under, or otherwise relating, to the Assigned Contracts), including rights under vendors' and manufacturers' warranties, indemnities and guaranties; <u>provided</u>, <u>however</u>, that nothing in this subsection shall include any claims Sellers may have arising out of or related to any actions

3

commenced by Sellers or any party pursuant to Chapter 5 of the Bankruptcy Code, except for actions arising under section 549 of the Bankruptcy Code with respect to transfers of property that would not otherwise have been Excluded Assets;

(q)     any counterclaims, setoffs or defenses that Sellers may have with respect to any liabilities assumed pursuant to Section 2.1; and

(r)     Sellers' intangible assets (which may be otherwise described above) used in the operation of the Business, including Sellers' name, and any and all  goodwill of Sellers with respect to the Business, and any owned or licensed software.

Notwithstanding anything hereinabove to the contrary, Sellers shall not be obligated to sell, nor shall Buyer be obligated to purchase, any Asset that, at the Closing, Sellers do not own and have the right to sell under the terms of the Sale Order (as defined in Section 3.1(d)) or otherwise.  For purposes of this Agreement, "*Accounts Receivable*" shall mean Sellers' gross accounts receivable, notes receivable or other obligations receivable due from third parties, without adjustments for reserves or allowances for doubtful accounts, including, without limitation, CABS receivables arising on or after the Petition Date.  "*CABS*" shall mean Sellers' carrier access billing services.  "*Cancelled Accounts*" shall mean all cancelled and/or non-active customer accounts that have been terminated within the 12 month period prior to the Initial Closing.  "*Customer Accounts*" shall mean the accounts of all of Sellers' active customers and Cancelled Accounts.  "*Encumbrances*" shall mean any interest, pledge, lien, mortgage, security interest, judgment, demand, successor liability claim, charge of any kind or nature, tax, assessment, covenant, title defect, encroachment, claim (as and to the full extent that term is defined in Bankruptcy Code Section 101(5) of the Bankruptcy Code), obligation, option or right, whether imposed by agreement, understanding, law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) in or with respect to any assets of Sellers and/or against Sellers, as well as any other interest or burden of any kind.  "*Unbilled Revenue*" shall mean the revenue associated with the goods and services provided by Sellers to their customers as of the Initial Closing Date that has not been invoiced or billed to such customers as of the Initial Closing Date.  Unbilled Revenue shall include CABS to the extent arising on or after the Petition Date.

1.2     Excluded Assets.  Sellers shall not sell, and Buyer shall not purchase, any of the following assets of Sellers:

(a)     all assets and items listed on Schedule 1.2(a);

(b)     all claims, derivative and non-derivative, against Sellers' current and former officers and directors, as well as any and all claims against Sellers' insurance policies that insure against such claims against the former and current officers and directors and all claims against their former and current auditors, and any right to any proceeds from any such claim, whether from insurance sources or otherwise (collectively, the "*D&O Claims*") and all avoidance and recovery actions under Chapter 5 of the Bankruptcy Code, other than actions arising under section 549 of the Bankruptcy Code with respect to transfers of property that otherwise would not have been Excluded Assets;

4

(c)     all cash on hand, cash on deposit, checks received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit and marketable securities, including interest accrued thereon, held by or on behalf of the Sellers, but excluding advance payments and security deposits related solely to the Assets as provided in Section 1.1(a) of this Agreement;

(d)     any rights, claims or causes of action of Sellers against third parties relating to the properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than any rights, causes of action or defenses of the Sellers against any third party under any Assigned Contract, except for accounts receivable arising before the Petition Date under any Assigned Contract, which accounts receivable are Excluded Assets under Section 1.1(f) of this Agreement;

(e)     all Accounts Receivable arising before the Petition Date except Accounts Receivable under any Assigned Contract;

(f)     any and all contracts that are not Assigned Contracts ("***Excluded Contracts***") and any and all rights thereunder and prepaid assets related thereto;

(g)     any stock or other equity interest in Sellers or other subsidiary of Sellers, and any State PUC Authorizations (as defined in Section 3.9) and FCC Authorizations (as defined in Section 3.9) owned or in the name of nWire, except to the extent that any such State PUC Authorizations and FCC Authorizations are used or useful in the operation Business as currently conducted, in which case such State PUC Authorizations and FCC Authorizations shall instead be deemed Assets assigned to Buyer hereunder to the extent assignable under applicable non-bankruptcy law:

(h)     any and all rights of the Sellers under this Agreement and any other ancillary documents entered in connection herewith, and all consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof and all bank accounts and any right, claims or causes of action of Sellers under this Agreement;

(i)     all patents and applications, renewals, registrations, and extensions regarding any patents of Sellers, each as set forth on Schedule 1.2(a) (the "***Excluded Intellectual Property***"), except to the extent that any such Excluded Intellectual Property is used or useful in the operation Business as currently conducted, in which case such Excluded Intellectual Property shall be subject to a perpetual royalty free non-exclusive license from the appropriate Seller to Buyer;

(j)     all insurance benefits, including rights and proceeds, insurance premiums, all rights of Sellers relating to claims for refunds, rebates, receivables and rights to offset for any Taxes, including without limitation any prepaid Taxes that relate to taxable periods ending on or before the relevant Closing Date, or any other right to payment, settlement or adjustment of the Sellers from any Governmental Body that relate to Assets or periods ending on or before the relevant Closing Date; and

(k)    all state certifications, license, registrations or other authorizations held by Sellers in the states listed on Schedule 1.2(a) (the "***Excluded State PUC Authorizations***").

1.3    Purchase Price.    The cash consideration to be paid by Buyer at the Closings for the purchase of the Assets will be the sum of $9,750,000 plus the Cure Amounts, as defined in Section 2.1 hereof (such sum is the "***Purchase Price***").  The Purchase Price shall be allocated among asset classes and descriptions as described on Schedule 1.3.  The Purchase Price shall be reduced on a dollar-for-dollar basis by (x) the amount by which the Working Capital Amount as of the Initial Closing is less than One Million Dollars ($1,000,000.00) (the "***Working Capital Requirement***").    The "***Working Capital Amount***" is the difference between (x) the Acquired Accounts Receivable, *less* (y) the Assumed Accounts Payable (as defined by Section 2.1).  At least two business days prior to the Initial Closing, Sellers shall deliver to Buyer a preliminary schedule of the Working Capital Amount consisting of Assumed Accounts Payable and Acquired Accounts Receivable, and a calculation of the Working Capital Amount.  At the Initial Closing, Sellers shall deliver a final schedule of the Working Capital Amount.  Within seven (7) business days after the Initial Closing Date, Buyer shall prepare and deliver to Sellers a written statement (the "***Final Working Capital Amount Calculation***") setting forth Buyer's good faith calculation of the Working Capital Amount as of the Initial Closing Date.  If the Working Capital Amount is less than the Working Capital Requirement, the Final Working Capital Amount Calculation shall contain a recalculation of the Purchase Price.  The Sellers shall have the right to review the books and records of the Business and to discuss with Buyer the preparation of the Final Working Capital Amount Calculation, and any objection to such calculation shall be lodged in writing within three (3) business days after receipt thereof.  The Buyer and Sellers will negotiate in good faith to resolve within five (5) business days of delivery of a notice of objection the Final Working Capital Calculation. If they are unable to resolve such objection within such time period, either Buyer or Sellers may file a motion with the Bankruptcy Court to rule on the Final Working Capital Calculation and the Working Capital Amount. If no objection is made within such time period, the Final Working Capital Amount calculation shall become final.  Once the Working Capital Amount has been determined in accordance with the foregoing procedures, if the Working Capital Amount is less than the Working Capital Requirement (the "Working Capital Shortfall"), then the Escrow Amount shall be reduced by an amount equal to the Working Capital Shortfall and such amount shall be wire transferred by the Escrow Agent in immediately available funds to such account as Buyer shall designate.

1.4    Earnest Money.    As a sign of Buyer's sincere interest in closing the transactions contemplated herein, Buyer will submit a wire transfer to Comerica Bank, for the account of Unipoint Holdings, Inc., Account No. 1892024330, ABA No. 0121137522, the amount of not less than 15% of the Purchase Price (the "***Earnest Money***") within one business day following the execution and delivery of this Agreement by the parties hereto. The Earnest Money will then be immediately transferred to an account of the third party escrow agent selected by the Buyer and Sellers (the "Escrow Agent") promptly upon the establishment of such account. The Earnest Money and all accrued interest thereon will be credited against the Purchase Price to be paid on the Initial Closing Date.  If the Initial Closing does not occur for any reason (other than due to a breach of this Agreement by Buyer, in which case the Earnest Money shall be retained by Seller), the Earnest Money and all accrued interest thereon shall be promptly returned to Buyer.

## ARTICLE 2

## ASSUMPTION OF LIABILITIES

2.1     Liabilities Assumed.  Buyer will assume all post-Petition Date accounts payable that relate to the conduct of the Business or any of the Assigned Contracts (collectively, the "Assumed Accounts Payable").  For the avoidance of doubt, such Assumed Accounts Payable shall not include Seller's legal or other professional fees or expenses or any brokerage or other consultant fees or expenses incurred in connection with the transactions contemplated by this Agreement and shall not include any Taxes or Regulatory Fees arising prior to the Petition Date.  At least ten business days prior to the Initial Closing Date, Sellers shall deliver to Buyer their proposed Schedule 1.1(e) (Assigned Contracts) to this Agreement.  Sellers shall provide appropriate notice to all non-debtor parties to the contracts identified in Schedule 1.1(e) of the possibility that their contracts may be assigned to Buyer, along with the amounts asserted by Sellers as being required to cure any pre-closing monetary default under any such contracts under section 365(b) of the Bankruptcy Code.  Such non-debtor parties shall be provided with an opportunity to object, and any objection that cannot be resolved consensually shall be resolved by the Bankruptcy Court.  At least five business days prior to the Final Closing Date, Buyer shall notify Sellers which contracts on Sellers' proposed Schedule 1.1(e) that Buyer agrees to accept assignment of, and thereafter Sellers shall finalize Schedule 1.1(e).  On or prior to the Final Closing Date, Buyer will execute separate agreements to pay the amounts required to be paid in order to cure any pre-closing monetary default under any Assigned Contract as required under § 365(b) of the Bankruptcy Code (the "*Cure Amounts*"), except, with respect to the Essential Contracts, any amount that exceeds the Cure Cap (as such terms are defined in Section 2.2 hereof), which, pursuant to Section 2.2, shall be the sole responsibility of the Sellers.  Buyer shall pay the Cure Amounts directly to the counterparties to such Assigned Contract as agreed by Buyer and the counterparties.  Except for the Assigned Contracts, those items specifically set forth on Schedule 2.1, and the Cure Amounts (all of which Buyer shall assume), Buyer does not, and shall not, assume, and Sellers shall remain liable for, any and all liabilities, obligations, claims and commitments of or against Sellers, whether the same are known or unknown, existing, contingent upon future events or circumstances, accrued, funded, unfunded or otherwise, including without limitation:

(a)     any liabilities or obligations attributable to any claims arising from or relating to injuries to person or property which either occur prior to the Initial Closing Date, or occur after the Initial Closing Date and arise from or relate to any act or omission by Sellers prior to the Initial Closing Date (or, in the case of liabilities or obligations attributable to an Assigned Contract occurring prior to the applicable Closing Date for such Assigned Contract, or occurring after the applicable Closing Date with respect to such Assigned Contract and arising from or relating to any act or omission by Sellers prior to such Closing Date);

(b)     any liability or obligation resulting from any formal or informal, written or unwritten agreement of Sellers with respect to severance pay, bonus, pension, health or medical benefit, or any other employee benefit or fringe benefit plan;

(c)     obligations under any collective bargaining agreement covering any employees of Sellers;

7

(d)      any liability or obligation with respect to any employee, employee benefit or employment obligation of Sellers or the termination thereof, all of which shall be retained as the sole obligation of Sellers;

(e)      any liability or obligation to any Governmental Body arising in connection with the Excluded State PUC Authorizations or any services provided by any Seller thereunder;

(f)      any liability or obligation resulting from any third party claims or judgments relating to Seller practices, billings, and charges prior to the Petition Date; or

(g)      any liability to Governmental Bodies and/or private persons under any Environmental Laws arising from or related to the operations of Seller, or the condition of the Assets at the time of Closing.  For purposes of this Agreement, "***Environmental Laws***" means all federal, state or local laws, regulations, statutes, codes, rules, ordinances, resolutions, directives, orders, consent orders or decrees, guidance documents, policy statements, or voluntary cleanup programs of governmental/regulatory agencies, judicial decrees, standards, permits and licenses, or any judicial or administrative interpretation of any of the foregoing, pertaining to the protection of land, water, air, health, or the Environment.  "***Environment***" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, groundwater, drinking water supply and ambient air, and also includes indoor air to the extent it is regulated under any Environmental Laws.

2.2      Essential Contracts.  Schedule 2.2 contains a list of contracts that Sellers have identified as "***Essential Contracts***," along with the corresponding Cure Amounts proposed by Sellers for all such contracts (the "***Cure Cap***").  The Essential Contracts are included in the Assigned Contracts, except that, notwithstanding Section 2.1 hereof, the Essential Contracts shall be assumed by Sellers, and assigned to Buyer, as of the Initial Closing Date.  Buyer shall obligated to pay the actual Cure Amount associated with the Essential Contracts in an amount not to exceed the Cure Cap, and Sellers shall be obligated to satisfy any portion of the actual Cure Amount for all Essential Contracts that exceed the Cure Cap  The actual Cure Amount for each Essential Contract shall be determined by agreement of Buyer, Sellers, and the applicable contract counterparty or, if the parties do not agree, then by the Bankruptcy Court, on or before the date of the Sale Hearing.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyer as follows:

3.1      Status.

(a)      Corporate Existence, Qualification and Power.  Each Seller is a corporation or limited liability company duly incorporated or organized, entitled to conduct business and validly existing under the laws of the state of its incorporation or organization. Each Seller is qualified to do business as a foreign corporation or limited liability company in such jurisdictions in which it does business.  Sellers have the corporate or limited liability

company power to own the assets that they own, lease the assets that they lease and otherwise to conduct the Business as currently conducted.

      (b)    <u>Authorization</u>.

      (i)    Sellers have the right, power and authority to enter into this Agreement and, upon receipt of the Sale Order (as defined in Section 6.4(d)), Sellers will have the right, power and authority to consummate the sale of the Assets and the other transactions contemplated by, and otherwise to comply with and perform their obligations under this Agreement;

      (ii)    Upon receipt of the Sale Order, the execution, delivery and performance by Sellers of this Agreement will have been duly authorized by all necessary corporate action of Sellers in compliance with governing or applicable agreements, instruments or other documents (including, as applicable, its articles of incorporation, bylaws, certificate of formation or limited liability company or operating agreement (as amended)) and applicable law; and

      (iii)    This Agreement constitutes the valid and binding agreement of Sellers, enforceable against Sellers in accordance with its terms, subject to the receipt of the Sale Order.

      (c)    <u>Absence of Violations or Conflicts</u>.  Except as disclosed in <u>Schedule 3.1(c)</u> and except to the extent that any restrictions or conditions are invalidated by the Bankruptcy Code and/or the Sale Order, the execution and delivery of this Agreement by Sellers and the consummation by Sellers of the sale of the Assets and the other transactions contemplated by, or other compliance with or performance under, this Agreement, do not and will not with the passage of time or giving of notice or both, constitute a violation of, be in conflict with, constitute a default or require any payment under, permit a termination of, require any consent under, or result in the creation or imposition of any Encumbrance or other adverse claim or interest upon any of the Assets under (i) any contract, agreement or license to which either of Sellers is a party or to which it or any of its respective assets or properties are subject or bound, except for contracts, agreements or licenses requiring consents that have been obtained or will have been obtained as of Closing, (ii) any judgment, decree or order of any Governmental Body to which Sellers or any of their respective properties are subject or bound, (iii) any applicable law, or (iv) any governing or applicable agreements, instruments or other documents, including, as applicable, articles of incorporation, bylaws, articles of organization or limited liability agreements (as amended).

      (d)    <u>Governmental Permits</u>.  Except as set forth in <u>Schedule 3.1(d)</u> and to the Best of Sellers' Knowledge, as of the date of this Agreement: (i) a list of all of the licenses, certificates, approvals, registrations and other permits and authorizations from a Governmental Body (collectively, "***Governmental Permits***") that are held by Sellers has been provided to Buyer; (ii) Sellers are unaware of any written or threatened in writing notice of cancellation or of default concerning any Governmental Permit used in the operation of Sellers' business; (iii) Sellers are unaware of any written or threatened in writing notice of violation, notice of forfeiture, order to show cause or complaint concerning the suspension or revocation, or notice

9

of apparent liability with respect to any Governmental Permit used in the operation of Sellers' Business; and (iv) Sellers are unaware of any written notice of violation, notice of forfeiture, order to show cause or complaint concerning Sellers' compliance with applicable communications laws. For purposes of this Agreement, "*Governmental Body*" shall mean any government, quasi-governmental entity or other governmental or regulatory body or agency, whether foreign, federal, state or local, or any agency, instrumentality, court or authority thereof.

(e)     <u>Consents and Approvals</u>. To the Best of Sellers' Knowledge, other than (i) obtaining the Sale Order and (ii) or the consents, approvals, and other authorizations of, and the notices and registrations or other filings to, the FCC and State PUCs set forth on <u>Schedule 3.1(e)</u> (respectively the "*FCC Consents*" and "*State PUC Consents*"), no consent, approval order or authorization of, or registration, declaration or filing with, any court, regulatory authority, or other Governmental Body is required for the execution and delivery of this Agreement or the consummation by Sellers of the transactions contemplated by this Agreement. Pursuant to Section 5(b) of the Bid Procedures Order, Sellers have consulted with the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "*Committee*") and with Hercules before selecting Buyer as a Stalking Horse (as such terms are defined in the Motion referred to in the Bid Procedures Order).

3.2     <u>Taxes and Regulatory Fees.</u>

(a)     <u>Definitions</u>. For purposes of this Agreement:

(i)     The term "*Code*" shall mean the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

(ii)     The term "*Returns*" shall mean, collectively, all reports, declarations, estimates, returns, information statements, and similar documents relating to, or required to be filed in respect of, any Taxes (defined below); and (b) any statements, returns, reports, or similar documents required to be filed pursuant to the Code or pursuant to any income, excise, or other tax provision of federal, territorial, state, local, or foreign law; and the term "*Return*" means any one of the foregoing Returns.

(iii)     The term "*Taxes*" shall mean (a) all net income, gross income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, employment, payroll, excise, transfer, documentary, mortgage, property, windfall profits, customs, duties, and other taxes, fees, assessments or charges of any kind whatever, together with any interest, penalties and other additions with respect thereto, imposed by any federal, territorial, state, local or foreign government; and (b) any penalties, interest, or other additions to tax for the failure to collect, withhold, or pay over any of the foregoing, or to accurately file any Return; and the term "Tax" shall mean any one of the foregoing Taxes. Notwithstanding the foregoing, however, when used with reference to a specified person (for example and without limitation, "*Taxes of Sellers*"), the terms "*Taxes*" and "*Tax*" shall

10

include only those amounts for which Buyer or any affiliate thereof is, or could become, liable in whole or part (including, without limitation, any obligation in connection with a duty to collect, withhold, or pay over any Tax, any obligation to contribute to the payment of any Taxes determined on a consolidated, combined, or unitary basis, any liability as a transferee, or any liability as a result of any express or implied obligation to indemnify or pay the Tax obligations of another person or entity) that remains due and payable by the Buyer from and after the entry of the Sale Order.

(iv)     The term "**Regulatory Fees**" shall mean fees and other contributions required pursuant to state or federal telecommunications laws (including without limitation, state and federal universal service support mechanisms, intrastate or interstate telecommunications relay services, administration of the North American Numbering Plan, shared costs of local number portability administration) and regulatory fees imposed by quasi-governmental or non-governmental entities.

(v)     The term "**Knowledge**" as applied to any party shall mean the actual knowledge of the current officers of such party.  The term "**Best of Sellers' Knowledge**" shall mean the actual knowledge of the current officers of Sellers, after having made due and diligent inquiry of the records of such party and each other relevant person reasonably believed to have actual knowledge of the matters represented

(b)     <u>Taxes Secured by Assets</u>.  <u>Schedule 3.2(b)</u> sets forth the taxes and claimed taxes that are secured by a first priority lien under applicable non-bankruptcy law. Notwithstanding any other agreement to the contrary, Sellers will create an "**Ad Valorem Tax Reserve**" in the amount set forth on <u>Schedule 3.2(b)</u> from the Purchase Price with which to pay such taxes as and when such claims and amounts are resolved by final order of the Bankruptcy Court; *provided, however,* that if the Ad Valorem Tax reserve proves, for any reason, to be insufficient to fully satisfy any tax claims secured by any of the Assets, the parties holding such tax claims shall nonetheless have no recourse to Buyer or the Assets, which shall in any event be sold free and clear of any such claims pursuant to section 363(f) of the Bankruptcy Code.

(c)     <u>Regulatory Fees</u>.  Except as set forth in <u>Schedule 3.2(c)</u>, there are no pending or, to Sellers' Knowledge, threatened audits, investigations, claims, proposals or assessments for or relating to any Regulatory Fees, whether arising before or after the Petition Date, and there are no matters under discussion with Sellers and any relevant authorities with respect to Regulatory Fees that could reasonably be expected to result in any Regulatory Fees for which Buyer would be liable after the Initial Closing Date other than Regulatory Fees that have accrued in connection with revenue received since the Petition Date for which Buyer is liable pursuant to <u>Section 2.1</u> of this Agreement.

3.3     <u>Personal Property; Title to Assets</u>.  For purposes of this Agreement, "**Property**" or "**Properties**" collectively refers to those tangible personal properties of Sellers that are included among the Assets to be sold to Buyer.  <u>Schedule 3.3</u> lists all of the Properties according to the Sellers' books and records with a value of greater than $5,000 used in or

necessary for the operation of the Business.  With the exception of any dispositions by Sellers in the ordinary course of business (as detailed in a supplemental disclosure schedule to Buyer), Schedule 3.3 remains true, correct and complete as of the date hereof Sellers have good title to all of the Properties owned by it as indicated on Schedule 3.3; and (ii) none of the Properties is subject to any lien, claim or other encumbrance that will not be removed pursuant to the Sale Order except liens for taxes not yet due and payable.  Sellers will, upon the entry of the Sale Order and the consummation of the transactions contemplated hereby, transfer, and the Buyer will obtain all right, title and interest in and to, the Assets free and clear of any and all Encumbrances other than the liabilities assumed under Section 2.1.

3.4     Intellectual Property Rights.

(a)     Schedule 3.4 contains a complete and accurate list of (i) all trade or corporate names used by Sellers in the Business; (ii) all Business-related computer software owned by Seller; (iii) all licenses and other rights granted by Sellers to any third party with respect to Business-related computer software rights; and (iv) all licenses and other rights granted by any third party to Sellers with respect to Business-related computer software rights, together with a description of the subject matter licensed.

(b)     Except as set forth on Schedule 3.4, (i) one or more of the Sellers are the registered owner, senior or priority user, or otherwise has superior rights in and to, or has valid, enforceable and effective written licenses to use, all of the Intellectual Property Rights listed in Schedule 3.4; (ii) during the two (2) years preceding the date of this Agreement, no claim by any third party contesting the validity, enforceability, use or ownership of any Intellectual Property Rights owned or used by Sellers have been made or, to the Sellers' Knowledge, threatened and no such claim is currently outstanding; (iii) during the two (2) years preceding the date of this Agreement, to Sellers' Knowledge, Sellers have not received any notice of, and is not aware of any facts which indicate a likelihood of, any infringement or misappropriation by any third party with respect to the Intellectual Property Rights of Sellers, nor to Sellers' Knowledge have Sellers received any claim alleging infringement or misappropriation of any Intellectual Property Rights of any third party; (iv) to Sellers' Knowledge, Sellers have not infringed, misappropriated or otherwise conflicted with any Intellectual Property Rights of any third party, nor are Sellers aware of any infringement, misappropriation or conflict which will occur as a result of the continued operation of the Business as conducted or as currently proposed to be conducted; and (v) the Intellectual Property Rights listed in Schedule 3.4 constitute all of the intellectual property rights related to, used or held for use in, necessary to the operation of the Business.

(c)     To Sellers' Knowledge, neither Sellers nor any employee or agent of Sellers nor any other person or entity, directly or indirectly, (i) has disclosed any of Sellers' trade secrets, formulas, product specifications, manufacturing and production processes and techniques or other confidential information of Sellers (collectively, the "**_Information_**") to any other person or entity, except in the ordinary course of business (as conducted before, during or after the filing of the Chapter 11 Cases) or to the Committee or potential purchasers of the assets of Sellers in connection with such purchasers' due diligence investigation of Sellers in accordance with appropriate confidentiality agreements, or (ii) has used the Information for any purpose other than in connection with the performance of such person's duties to Sellers.  Sellers

take reasonable precautions with their employees and others to protect their Intellectual Property Rights and are unaware of any third party with access to Information having used the Information for its own purposes or for any purpose other than in connection with the Business.

3.5     Litigation; Insurance.  Except for the Chapter 11 Cases and all claims filed against Sellers therein, or as disclosed in Schedule 3.5, Sellers are not (i) engaged in, a party to, subject to or, to the Best of Sellers' Knowledge, threatened with any claim, legal or equitable action, or other proceeding (whether as plaintiff, defendant or otherwise and regardless of the forum or the nature of the opposing party); (ii) to Sellers' Knowledge, subject to any unasserted claim, the assertion of which is likely and which, if asserted, will seek damages, an injunction or other relief against Sellers which claim would have a material adverse effect on the Assets or the operation of the Business; or (iii) a party to or subject to any judgment, order or decree against Sellers or Sellers' assets.  Any claims, litigation or other proceeding listed on Schedule 3.5 and involving injury to persons or property, including any product liability claim, is covered by the insurance described on Schedule 3.5, which description includes a summary of the kind of policy covering such matter and its policy limits.  Except as set forth in Schedule 3.5, there has been no reservation of rights by any insurance carrier, and no such reservation is threatened, concerning the coverage of Sellers with respect to any matter required to be disclosed pursuant to this Section 3.5.

3.6     Accounts Receivable.  All of Sellers' accounts receivable arising under the Assigned Contracts are valid and enforceable claims (Sellers make no representation or warranty regarding the collectability of any such accounts receivable); the goods and services sold and delivered which gave rise to such accounts were sold and delivered in conformity in all material respects with the applicable purchase orders, agreements and specifications.  From and after the date occurring ninety (90) days prior to the Petition Date, Sellers have made no change in policies or practices with respect to the payment of accounts payable or accrued expenses or the collection of accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable, in each case, other than in the ordinary course of business.  To the Best of Sellers' Knowledge, there are no rights of set-off or claims against such accounts receivable possessed by the account debtors of Sellers.

3.7     Financial Statements.   Sellers shall furnish to Buyer copies of the reviewed but unaudited consolidated balance sheet of Sellers as of December 31, 2012, and the related consolidated statement of income and retained earnings and statement of cash flows for the period beginning January 1, 2012, and ending on December 31, 2012 (the "**2012 Financial Statements**"), plus monthly financial statements thru May 2013 (the "**2013 Financial Statements**").  Except as set forth in Schedule 3.7, to the Best of Seller's Knowledge, (a) the 2013 Financial Statements present fairly, in all material respects, the financial position of Sellers as of such dates, and the results of operations and cash flows for the periods presented therein.

3.8     Deposits and Prepayments.  Except as set forth in Schedule 3.8, there are no deposits, prepayments for services or other prepaid items of Sellers.

3.9     FCC and State PUC Authorizations.   Schedule 3.9 sets forth all governmental licenses other authorizations (the "**FCC Authorizations**") issued or granted by the Federal Communications Commission ("**FCC**") held by Sellers, and all governmental

certificates, licenses, registrations, and other authorizations issued or granted by any of the state public utility commissions, agencies, boards or other similar Governmental Bodies ("**State PUCs**") of the states in which Sellers conduct the Business (the "**State PUC Authorizations**") held by the Sellers.  Except as set forth in Schedule 3.9, such FCC Authorizations or State PUC Authorizations are validly held and in full force and effect, and there is no outstanding notice of cancellation, termination, or non-renewal or, to the Knowledge of Sellers, any threatened cancellation, termination, or non-renewal with respect thereto.  None of the Sellers provide material intrastate telecommunications services in any state other than a state where such Seller holds a State PUC Authorization where such authorization is required and no Seller provides any material service pursuant to any Excluded State PUC Authorization where such authorization is required.

(a)      Except as set forth in Schedule 3.9(a), Sellers (i) are not subject to any restrictions or conditions applicable to its FCC Authorizations or State PUC Authorizations that materially limit the operations of the Business (other than restrictions or conditions generally applicable to FCC authorizations and State PUC authorizations of that type); (ii) are not in violation of or noncompliance with the terms and conditions of any such FCC Authorization or State PUC Authorization, except for possible violations or noncompliance that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect; and (iii) are not in violation of or noncompliance with any material law applicable to the Business, except for possible violations or noncompliance that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect.

(b)      Except as set forth in Schedule 3.9(b), there are no applications by Sellers, nor, to the Best of Sellers' Knowledge, any complaints or petitions, or other filings by others, or proceedings pending or threatened, before the applicable regulatory authorities relating to Sellers or the FCC Authorizations or State PUC Authorizations.

(c)      Except as set forth in Schedule 3.9(c), Sellers have made all reports, and paid all contributions and fees (including with respect to universal service support), required by any law applicable to the Business, except for the failure to file such reports or pay such fees that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect.

3.10     Leases.  Schedule 3.10 sets forth a true, correct and complete list and description of all leases, subleases, licenses and other occupancy or lease agreements, together with all amendments, supplements and nondisturbance agreements pertaining thereto, under which Sellers lease, sublease, license, occupy or use any real or personal property other than Intellectual Property (the "**Leases**").  Schedule 3.10 also lists the term of such leases, subleases, or licenses, any extension and expansion options, and the rent payable thereunder.  To Sellers' Knowledge, as of the date hereof, there are no disputes, oral agreements or forbearance programs in effect as to any of the Leases and Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any leasehold or subleasehold.  Sellers have provided Buyer with true, correct and complete copies of all such Leases.  As of the date hereof, other than the Leases, there are no agreements, contracts and commitments, whether written or oral, by which any of the assets, properties or the Business is bound.

14

3.11    Employment Matters; Employee Benefits.

(a)    Other than as set forth in Schedule 3.11(a) there are no employment or consulting contracts or arrangements, including pensions, bonus or profit sharing plans, or other severance or termination contracts or arrangements which constitute contractual obligations of Seller.

(b)    Sellers have complied with and shall comply with (to the extent required under the Bankruptcy Code) all of Sellers' obligations with respect to their employees and employment related contracts, including, without limitation, Sellers' Employee Benefit Plans.  Buyer shall have no obligations with respect to any of the same.

3.12    Compliance with Laws.  Except as set forth in Schedule 3.12, Sellers have complied with all laws applicable to the Business in all material respects, as presently conducted, including, without limitation, (a) all environmental laws, and (b) all provisions of laws relating to labor relations, equal employment practices, fair employment practices, entitlement, prohibited discrimination, terms and conditions of employment, wages and hours, or other similar employment practices or acts.  Sellers have not received any notice from or otherwise been advised that any Governmental Body or other person is claiming any violation or potential violation of any law.  Other than with respect to the Chapter 11 Cases, no claim has been made by any Governmental Body to the effect that the Business, as conducted by Sellers, fail to comply, in any respect (and no such claim is anticipated by Sellers), with any law, rule, regulation, or ordinance.

3.13    Brokers, Finders, etc.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Sellers in such manner as to give rise to any claim against Buyer for any brokerage or finders' commission or similar compensation.  Other than Q Advisors and each other party set forth on Schedule 3.13, no person or entity is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by Sellers in connection with the transactions contemplated by this Agreement.

3.14    Books and Records.  Sellers have made and kept (and given Buyer access to) Sellers' book and records, which, in reasonable detail, accurately and fairly reflect the activities and transactions of Sellers, the dispositions of assets related to the Business, and the financial condition of Sellers, including, without limitation, the existence of any and all liabilities, whether actual or contingent.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT, THE ASSETS WILL BE CONVEYED "AS-IS" "WHERE IS" AND WITH ALL FAULTS.  SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ASSETS OR ANY OTHER MATTER EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR TYPE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY SELLER INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

4.1     Status of Buyer.

(a)     Corporate Existence and Status.     Buyer is a limited liability company duly organized, entitled to conduct business and validly existing under the laws of the State of Delaware.

(b)     Authorization.

(i)     Buyer has the right, power and authority to enter into this Agreement and to consummate the purchase of the Assets and the other transactions contemplated by, and otherwise to comply with and perform its obligations under, this Agreement;

(ii)     The execution and delivery by Buyer of this Agreement, and the consummation by Buyer of the purchase of the Assets and the other transactions contemplated by, and other compliance with and performance of its obligations under this Agreement have been duly authorized by all necessary limited liability company action on the part of Buyer in compliance with governing or applicable agreements, instruments or other documents (including its certificate of formation and operating agreement (as amended)) and applicable law; and

(iii)     This Agreement constitutes the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

(c)     Absence of Violations or Conflicts.     To Buyer's Knowledge, the execution and delivery of this Agreement and the consummation by Buyer of the purchase of the Assets and the other transactions contemplated by, or other compliance with or performance under, this Agreement do not and will not with the passage of time or giving of notice or both, constitute a violation of, be in conflict with, or require any consent under, (i) any contract, agreement or license to which Buyer is a party or to which it or any of its assets or properties are subject or bound, (ii) any judgment, decree or order of any Governmental Body to which Buyer or any of its properties are subject or bound, (iii) any governing or applicable agreements, instruments or other documents, including its certificate of formation and operating agreement (as amended), or (iv) except with respect to the FCC Consents and the State PUC Consents, any applicable law.

4.2     Consents and Approvals.     Except with respect to the obtaining of (a) the Sale Order and (b) the FCC Consents and the State PUC Consents, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Body on the part of Buyer is required in connection with its execution or delivery of this Agreement or the

16

consummation of the purchase of the Assets and the other transactions contemplated by, or other compliance with or performance under, this Agreement by Buyer.

4.3    Brokers, Finders, etc.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Buyer in such manner as to give rise to any claim against Sellers for any brokerage or finders' commission or similar compensation.

4.4    Purchase Price.  Buyer has sufficient cash in immediately available funds to pay the Purchase Price and to consummate the transactions hereunder.

## ARTICLE 5

## CLOSINGS AND CLOSING DATES

5.1    The Closings and the Closing Dates.  The closings of the sale of Assets and other transactions contemplated by this Agreement (the "**Closings**") shall take place at the office of Jackson Walker L.L.P., 100 Congress Avenue, Suite 1100, Austin, Texas 78701, commencing at 9:00 a.m. local time on the dates ("**Closing Dates**"), as follows:

(a)    Initial Closing.

(i)    The initial closing (the "**Initial Closing**") shall occur within seven (7) Business Days following the date upon which the conditions to Closing set forth in Article 9 and Article 10 (excepting only the conditions set forth in Section 9.9 (Interim Closing and Final Closing Conditions) shall have been satisfied or waived (the "**Initial Closing Date**"), unless such date is extended by agreement of the parties hereto.

(ii)    At the Initial Closing:

(A)    Buyer shall deposit with Escrow Agent the balance of the Purchase Price (together with the Earnest Money and all accrued interest thereon, collectively, the "**Escrow Amount**") to be released by Escrow Agent to Sellers in installments at the Closings in accordance with the terms of this Agreement;

(B)    Sellers shall sell, and Buyer shall purchase, the Initial Assets, free and clear of all Encumbrances, and Buyer shall assume at the Initial Closing any liabilities contemplated under Section 2.1 except to the extent that any Assigned Contract is not assigned at the Initial Closing;

(C)    Sellers and Buyer shall deliver to the Escrow Agent joint written instruction to transfer to Sellers, by wire transfer of immediately available funds from the Escrow Amount to a bank account designated by Sellers, an amount equal to the sum of the Purchase Price multiplied by the Release Ratio;

17

(D)     Buyer shall pay any Regulatory Payment then due and payable; and

(E)     The balance of the Escrow Amount shall be retained by the Escrow Agent and applied in accordance with the terms of this Agreement.

For purposes of this Agreement, "***Approved States***" shall mean any and all states of the United States in which the Business is operated and with respect to which (a) either Regulatory Approval has been obtained or no consent, waiver, approval, order, communications license, or authorization of the applicable State PUC is required by applicable law for the execution or consummation of this Agreement is required, and (b) Buyer has received all licenses and approvals for operation of the Business, if any, required by the applicable State PUC.  "***Initial Assets***" shall mean: (a) those Assigned Contracts along with any and all other Assets associated with operations in Approved States, (b) Sellers' Accounts Receivable associated with such operations as of the Initial Closing, and (c) all other Assets that may be transferred to Buyer without Regulatory Approval and that are designated by Buyer for transfer at the Initial Closing. "***Regulatory Approval***" shall mean any consent, waiver, approval, order, communications license, or authorization of the FCC or any of the State PUCs required by applicable law for the execution or consummation of this Agreement.  "***Regulatory Payments***" shall mean the amounts necessary to satisfy any asserted regulatory fees, assessments, fines, penalties or other payments assessed by the FCC, any State PUC, and the Universal Service Administrative Company, based upon Sellers' revenues or Sellers' conduct of the Business or any of the Assigned Contracts first arising prior to the Final Closing Date but after the Petition Date.  "***Release Ratio***" shall mean (a) with respect to the Initial Closing, 80% of the Purchase Price and (b) as to the remaining 20% of the Purchase Price or any remaining portion thereof (the "Remaining Purchase Price"), in the case of any Interim Closing, the percentage obtained by dividing (i) the monthly revenue for the full month preceding such Interim Closing, generated by the Assigned Contracts that have not been previously assigned to Buyer for those states as to which Regulatory Approval has been obtained since the Initial Closing or the prior Interim Closing, as the case may be, by (ii) the monthly revenue for the full month preceding such Interim Closing for all of the Assigned Contracts not previously assigned to the Buyer.

(b)     Interim Closing(s).  Approximately every forty-five (45) days after the Initial Closing or as otherwise mutually agreed to by the parties (each, an "***Interim Closing***"): (i) Seller shall sell, and Buyer shall purchase, the Assigned Contracts and other Assets for those states that have become Approved States since the last Closing (either Initial or Interim, as applicable), free and clear of all Encumbrances, and Buyer shall assume any liabilities contemplated under Section 2.1 that are associated solely with such Assigned Contracts and Assets; and (ii) the Escrow Agent shall pay to Seller from the Escrow Amount and by wire transfer of immediately available funds to a bank account designated by Seller, an amount equal to the remaining Purchase Price multiplied by the applicable Release Ratio.

(c)     Final Closing.

(i)     The final closing of the transactions contemplated in this Agreement (the "***Final Closing***") shall take place on the earlier to occur of (1) the 180th day following the Initial

18

Closing Date, or (2) the second business day following the date on which all Regulatory Approvals from State PUCs have been obtained by Buyer (the "**Final Closing Date**").

    (ii)    At the Final Closing:

    (A)    Sellers shall sell, and Buyer shall purchase, the remaining Assets, free and clear of all Encumbrances, and Buyer shall assume any liabilities contemplated under Section 2.1 that are associated with Assigned Contracts assigned at the Final Closing but not previously assumed and assigned; and

    (B)    the Escrow Agent shall pay to Sellers, by wire transfer of immediately available funds to a bank account designated by Sellers, the sum of: (1) the balance of the Escrow Amount plus (2) any interest accrued on the foregoing minus (3) any Purchase Price adjustment required under Section 1.3.

    (iii)    From and after the Final Closing, Buyer shall be entitled to retain one hundred percent (100%) of net profits for any ongoing operations in states where any Regulatory Approvals have not been obtained as of the Final Closing.

    (d)    The Assets shall remain the property of Sellers, and any risk of loss thereof, through the date immediately prior to the respective Closing Date at which such Assets are sold or conveyed to Buyer, and thereafter shall be the property of Buyer with the risk of loss thereof allocated to the Buyer.  Except to the extent otherwise set forth in this Agreement, the liabilities contemplated to be assumed under Section 2.1 that are associated solely with associated with such Assets shall remain the responsibility of Seller through the date immediately prior to the Closing Date at which such liabilities are transferred to Buyer, and thereafter shall be the responsibility of Buyer.

    5.2    Conveyances at Closings.

    (a)    At each Closing, and in connection with effecting and consummating the transactions contemplated hereby, Sellers shall deliver the following to Buyer, if applicable:

    (i)    an executed Bill of Sale, in form and substance satisfactory to the Buyer and Sellers, identifying the portion of the Assets being sold, assigned or transferred at such Closing;

    (ii)    if applicable, an executed counterpart of an Assumption and Assignment Agreement, in form and substance satisfactory to the Buyer and Sellers, with respect to the Assigned Contracts to be assumed and assigned at such Closing;

    (iii)    such other instruments as shall be reasonably requested by Buyer to vest in Buyer title in and to the portion of the Assets being sold, assigned

or transferred at such Closing in accordance with the provisions hereof and the Sale Order;

        (iv)     at the Initial Closing only:

(A)     an executed escrow release letter directing the Escrow Agent to release the Earnest Money and all accrued interest thereon to Sellers for credit against the portion of the Purchase Price payable on the Initial Closing Date in accordance with <u>Section 1.4</u> and any additional amounts from the Escrow Amount necessary to pay that portion of the Purchase Price due on the Initial Closing Date; and

(B)     an executed Management Services Agreement in the form attached hereto as Exhibit A (the "***Management Services Agreement***") and an executed Escrow Agreement in form and substance acceptable to Buyer, Sellers and Escrow Agent (the "***Escrow Agreement***").

        (v)     at each Interim Closing only, an executed escrow release letter directing the Escrow Agent to release to Sellers the portion of the Escrow Amount payable at each Interim Closing in accordance with <u>Section 5.1(b)</u>.

        (vi)     at the Final Closing only, an executed escrow release letter directing the Escrow Agent to release the Escrow Amount to Sellers in accordance with <u>Section 5.1(c)</u>.

        (b)     In connection with effectuating and consummating the transactions contemplated hereby:

        (i)     at the Initial Closing only, Buyer shall deliver:

(A)     a certified copy of the Sale Order;

(B)     to Sellers an executed Management Services Agreement and an executed Escrow Agreement in form and substance acceptable to Buyer, Sellers and Escrow Agent;

(C)     to Escrow Agent, an executed escrow release letter directing the Escrow Agent to release the Earnest Money and all accrued interest thereon to Sellers for credit against the portion of the Purchase Price payable on the Initial Closing Date in accordance with <u>Section 1.4</u> and any additional amounts from the Escrow Amount necessary to pay that portion of the Purchase Price due on the Initial Closing Date; and

(D)     to Escrow Agent, the Escrow Amount, by wire transfer of immediately available funds, to be held pursuant to the Escrow Agreement and paid to Sellers in accordance with the terms of this Agreement.

20

(ii)     at each Interim Closing only, Buyer shall deliver an executed escrow release letter directing the Escrow Agent to release to Sellers the portion of the Escrow Amount payable at each Interim Closing in accordance with Section 5.1(b).

(iii)    at the Final Closing only, Buyer shall deliver to Escrow Agent, an executed escrow release letter directing the Escrow Agent to release to Sellers the Escrow Amount in accordance with Section 5.1(c).

To the extent that a form of any document to be delivered under this Agreement is not attached as an exhibit, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Sellers.

5.3     Other Closing Matters.  Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on each Closing Date.

## ARTICLE 6

## COVENANTS OF SELLER

6.1     Conduct of Business by Seller Pending the Closing.  At all times prior to the Final Closing Date, Sellers shall conduct the Business in the usual and ordinary course and in accordance with their obligations as debtors-in-possession under the Bankruptcy Code.  Except as otherwise contemplated under this Agreement or ordered by the Bankruptcy Court, from the date hereof until the Final Closing Date, without the prior written consent of Buyer, which consent will not be unreasonably withheld or delayed, Sellers shall (x) refrain from selling, assigning, licensing, leasing, transferring or otherwise disposing of, in whole or in part, any of the Assets, except for sales made in the ordinary course of business, and (y) make no change in policies or practices with respect to the payment of accounts payable or accrued expenses or the collection of accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable, in each case, other than in the ordinary course of business.

6.2     Affirmative Covenants.  Subject to any conflicting obligation imposed on Seller as a debtor-in-possession under the Bankruptcy Code, from the date hereof to the Final Closing Date, Seller shall:

(a)     Use its good faith commercially reasonable efforts to operate the Business in the usual and ordinary course of business (and in substantially the same manner as the Business had been conducted prior to filing of the Chapter 11 Cases), including normal markdown practices and order fulfillment;

(b)     Undertake to maintain property and liability insurance in appropriate amounts of coverage with respect to the Assets;

(c)     Maintain, consistent with past practice (prior to filing of Sellers' Chapter 11 Cases), the Assets in good repair, order and condition, reasonable wear and tear

21

excepted, and use commercially reasonable efforts to preserve its possession and control of all of the Assets;

(d)      Allow, at all reasonable times up to and including the Final Closing Date, Buyer's employees, attorneys, auditors, accountants and other authorized representatives, reasonable access to the facilities, plants, properties, books, records, documents and correspondence of Sellers, in order that Buyer may conduct such investigation as it may desire of the Business;

(e)      Use commercially reasonable efforts (i) to comply in all material respects with all applicable laws relating to the conduct of the Business, and (ii) to conduct the Business to the Final Closing Date in such a manner that on the Final Closing Date the representations and warranties contained in this Agreement shall be true as though such representations and warranties were made on and as of such date, except for changes permitted or contemplated by the terms of this Agreement; and

(f)      Sellers shall not change recurring or non-recurring rates or sales strategies or collections processes for the Assets prior to the Initial Closing without the prior written consent of Buyer, in its commercially reasonable discretion.

6.3      <u>Consents and Closing Conditions</u>.      Sellers shall use commercially reasonable efforts to take such actions as may be appropriate in order to fulfill the closing conditions contained herein which are reasonably within their control.

6.4      <u>Bankruptcy Court Approvals.</u>

(c)      <u>Sale Pleadings</u>.  Sellers have previously filed with the Bankruptcy Court a motion [Doc. No. 255] requesting, among other things: (i) an order approving of the Bid Procedures (as hereafter defined), and (ii) ultimately approving the sale of the Assets conducted pursuant to the Bid Procedures (the "***Motion***").  A hearing on the Bid Procedures portion of the Motion was held on June 27, 2013 (the "***Bid Procedures Hearing***") and a hearing on the Sale Motion is scheduled for July 22, 2013 (the "***Sale Hearing***").

(d)      <u>Bid Procedures</u>.  As used herein, the term "***Bid Procedures***" refers to the bid procedures approved in the Order approving the Bid Procedures [Doc. No. 280] (the "***Bid Procedures Order***").

(i)      <u>Termination Fee</u>.  Consistent with the Bid Procedures Order, the Buyer shall be entitled to a termination fee in the amount of $292,500 (the "***Termination Fee***") upon the occurrence of an Alternative Transaction (as defined in the Bid Procedures Order).  The parties hereto each hereby acknowledge and agree that Buyer has incurred substantial costs and expenses relating to this transaction, including without limitation, the costs and expenses associated with the performance of due diligence of Sellers, the negotiation and execution of this Agreement (and the exhibits and schedules related thereto) and the documents which preceded this Agreement, and has undertaken substantial risk as a result of incurring such costs and expenses.  Consistent with the Bid Procedures Order, the Termination Fee shall be paid without the need for any further Order of the Bankruptcy Court, from the proceeds of the first scheduled closing of any Alternative Transaction and, if applicable, from the proceeds of each subsequent

22

closing until paid in full; *provided, however,* that if the Alternative Transaction is a plan of reorganization, then the Termination Fee shall be paid upon the effective date of such plan. The procedures applicable to the auction of the Assets (the "*Auction*") shall be as set forth in the Bid Procedures Order.

(ii)    At the Auction, Sellers will take the Termination Fee into account when considering which offer constitutes the highest and best offer for the Assets. In addition, at the Auction, Sellers will consider the impact upon the estate of contracts assumed by Buyer in determining the highest and best offer.

(e)    Entry of Orders. The Sale Order shall have been entered by the Bankruptcy Court on or before July 31, 2013.

(f)    Sale Order. For the purposes of this Agreement, "*Sale Order*" shall refer to an order, in form and substance satisfactory to Buyer in its reasonable discretion, which shall, among other things: (i) find that the Buyer has acted in good faith and is therefore entitled to the protections of Section 363(m) of the Bankruptcy Code; (ii) acknowledge that the sale is a valid exercise of Sellers' business judgment; (iii) authorizing and approving, to the fullest extent permitted under Sections 105, 363(b) and 363(f) of the Bankruptcy Code, the sale of the Assets free and clear of any Encumbrances and declaring that Buyer has no liability and no successor liability with respect to the Assets, other than with respect to the liabilities assumed under Section 2.1, and only to the extent provided in this Agreement; (iv) declaring that, pursuant to Bankruptcy Rules 6006(d) and 6004(g), the Sale Order shall not be stayed but shall be effective immediately; (v) ratifying the sale process and Bid Procedures; (vi) authorizing and approving the assumption and assignment of the Assigned Contracts free and clear of any Encumbrance to the fullest extent permitted under Section 365 of the Bankruptcy Code, except for Buyer's obligations as assignee of Seller under the Assigned Contracts and this Agreement; (vii) approving the Management Services Agreement; and (viii) directing the Sellers to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Assets to Buyer.

## ARTICLE 7

## COVENANTS OF BUYER

7.1    Consents and Closing Conditions. Buyer shall use commercially reasonable efforts to obtain such consents from third parties and to take other actions as may be required in order to fulfill the closing conditions contained herein which are reasonably within its control including but not limited to (a) within a reasonable time period after Buyer becomes eligible for the Termination Fee, filing for and prosecuting Regulatory Approval before any state or federal agency that does not require the entry of the Sale Order to commence any relevant notice or approval period, (b) within a reasonable time period after entry of the Sale Order, filing for and prosecuting Regulatory Approval with every other state or federal agency in which Regulatory Approval is required; and (c) to cause the representations and warranties of Buyer in Article 4 to be true and correct on and as of the each Closing Date.

7.2     Access to Records.  After the Initial Closing Date and upon reasonable prior notice to Buyer, Buyer shall permit Sellers, the Committee or any successor of the Sellers, including without limitation any liquidating trustee or plan administrator appointed under a chapter 11 plan for any or all of the Sellers, at such party's expense during normal business hours, to have reasonable access to such of the former business records of Sellers as are from time to time then retained by Buyer.

7.3     Claims Retained by Sellers.  All claims described in Section 1.2(a) above remain with Sellers, its creditors and shareholders and such claims, if pursued, will be pursued for the exclusive benefit of the creditors of Sellers and the proceeds from the pursuit of any such claim shall be payable to the creditors of Sellers, regardless of who pursues such claims.  Buyer shall have no right to pursue any such claim or to seek any of the proceeds derived therefrom.

## ARTICLE 8

## TAX MATTERS

8.1     Cooperation and Records Retention.  From time to time, Sellers and Buyer shall permit reasonable access, and shall cause their respective accountants and other representatives to permit reasonable access by each other, to the information that they or their accountants or other representatives have within their control and that may be reasonably necessary in connection with the preparation of any Return or the examination by any taxing authority or other administrative or judicial proceeding relating to any Return.  Sellers and Buyer shall retain or cause to be retained, until the applicable statutes of limitations (including any extensions) have expired (or sooner if authorized by an order of the Bankruptcy Court and Sellers first provides Buyer with reasonable notice of the information to be destroyed and a reasonable opportunity to take possession of such information if Buyer so elects), copies of all Returns for all tax periods beginning before the Closing Date, together with supporting work schedules and other records or information that may be relevant to such Returns.

8.2     Tax Elections and Permits.  No new elections with respect to Taxes, or any changes in current elections with respect to Taxes, affecting the Assets shall be made by Sellers after the date of this Agreement without the prior written consent of Buyer.

8.3     Sales and Transfer Taxes.  Seller shall bear the responsibility for payment of Taxes in the event that any sales transfer or similar Tax is imposed against Sellers or Buyer as a result of the transactions contemplated hereby.  Sellers shall take any and all actions, at Buyer's expense, and only to the extent that such actions will not have a material adverse impact on Sellers or Sellers' Tax liability, that Buyer may reasonably request in order to minimize Buyer's tax obligations resulting from the transactions contemplated hereby.

8.4     Property Taxes.  Property Taxes on the Assets for calendar year 2013 will be pro-rated between Buyer and Sellers as of the Closing Date.

## ARTICLE 9

### BUYER'S CONDITIONS TO CLOSING

The obligation of Buyer to consummate the purchase of the Assets and the other transactions contemplated by this Agreement shall be subject to the fulfillment to Buyer's reasonable satisfaction of each of the following conditions:

9.1     Ordinary Course Operations.  The Business shall have been operated in the ordinary course of business through each Closing, consistent with past practices (as the Business has been conducted prior to filing the Chapter 11 Cases and in accordance with Sellers' obligations under Sections 6.1 and 6.2 hereof), with no increases in compensation and no distributions, dividends or changes in related party transactions.

9.2     Accuracy of Representations and Warranties.  All representations and warranties of Sellers contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects when made, and on and as of each Closing as though made on and as of such Closing, subject to Sellers' right to update and amend the Schedules hereto at any time before Closing with any material changes subject to the prior written consent of Buyer, in its sole discretion.

9.3     Performance of Covenants.  All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Sellers at or before each Closing shall have been duly and properly performed in all material respects.

9.4     Closing Documents.  Sellers shall have delivered all documents required to be delivered by it at Closing, as more specifically set forth in Article 5, in each case in form and substance satisfactory to Buyer.

9.5     No Changes.  There have been no material adverse changes to the Assets, normal wear and tear and insured loss excepted, between the date of this Agreement and the date of the relevant Closing with respect thereto.

9.6     Approval of Bankruptcy Court.  The Bankruptcy Court shall have entered the Sale Order.

9.7     Approval of FCC.  The FCC Consents shall have been obtained.

9.8     Regulatory Fees.  The Sale Order shall provide that Buyer will have no liability for any Regulatory Fees arising prior to the Petition Date, including, without limitation, any liability to the Universal Services Administration Company for such fees.

9.9     Interim Closing and Final Closing Conditions.  The obligations of Buyer to consummate the transactions to occur at the Interim Closing(s) and at the Final Closing are subject to the fulfillment, on or prior to the Interim Closing(s) and/or the Final Closing of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable law):

(i)     the State PUC Consents of the states with jurisdiction over the assets being conveyed at the Closing shall have been obtained;

(ii)     the Sale Order shall remain a Final Order; and

(iii)     there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

## ARTICLE 10

### SELLER'S CONDITIONS TO CLOSING

The obligation of Sellers to consummate the sale of the Assets and the other transactions contemplated by this Agreement shall be subject to the fulfillment to Sellers' reasonable satisfaction of each of the following conditions:

10.1     <u>Accuracy of Representations and Warranties</u>.   All representations and warranties of Buyer contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects when made, and on and as of each Closing as though made on and as of such Closing.

10.2     <u>Performance of Covenants</u>.   All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Buyer at or before each Closing shall have been duly and properly performed in all material respects.

10.3     <u>Closing Documents</u>.   Buyer shall have delivered the Purchase Price to Escrow Agent and all documents required to be delivered by it each Closing, as more specifically set forth in <u>Article 5</u>, in each case in form and substance reasonably satisfactory to Sellers.

10.4     <u>Approval of Bankruptcy Court</u>.   The Bankruptcy Court shall have entered the Sale Order.

## ARTICLE 11

### TERMINATION OF AGREEMENT

11.1     <u>Termination</u>.   Anything in this Agreement to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)     by mutual written consent of Buyer and Sellers (subject to the approval of the Bankruptcy Court) at any time, in which case the Earnest Money and all accrued interest thereon shall be returned to Buyer;

(b)     upon written notice from Buyer to Sellers if (A) Buyer is not the winning bidder at the Auction, or (B) one or more of the conditions set forth in <u>Article 9</u> is not

26

satisfied on or before the dates specified in this Agreement for any reason other than a breach of this Agreement by Buyer, including if the Bid Procedures Order is not entered in accordance with the terms of this Agreement, or (C) the Sale Order is not entered by the Bankruptcy Court on or before August 7, 2013, through no fault of Buyer, or (D) the Initial Closing has not occurred on or before November 30, 2013, through no fault of Buyer, and in each such case the Earnest Money and any Escrow Amounts held by the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(c)     upon written notice from Sellers to Buyer if Buyer is not the winning bidder at the Auction, the Earnest Money and any Escrow Amounts previously delivered to the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(d)     upon written notice from Sellers to Buyer if any of the conditions precedent to Sellers' obligations hereunder shall have become incapable of fulfillment through no fault of Seller, the Earnest Money and any Escrow Amounts held by the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(e)     upon written notice from Sellers to Buyer if the aggregate amount of the Cure Amounts for the Essential Contracts are greater than 110% of the Cure Cap. or

(f)     upon written notice from either party to the other party hereto if the Initial Closing does not occur on or before November 30, 2013 (unless the failure to consummate the purchase and sale of the Assets by such date shall be due to the action or failure to act of the party seeking to terminate this Agreement or any affiliate thereof), and if through no fault of Buyer, the Earnest Money and any Escrow Amounts previously delivered to the Escrow Agent, together with any interest thereon shall be returned to Buyer.

11.2     Effect of Termination.     If this Agreement is terminated and the transactions contemplated hereby are abandoned pursuant to Section 11.1, then:

(a)     the rights and obligations of the parties hereto under this Agreement shall terminate (other than the provisions of this Section, the provisions related to payment of the Termination Fee and Expense Reimbursement, and the treatment of the Earnest Money), there shall be no liability of any party hereto to any other party hereunder, and the parties shall not be obligated to proceed with the Closing and this Agreement shall be terminated; provided, however, that such termination shall not affect the right of any party to bring an action against another party for a breach occurring prior to the termination or for a wrongful termination; and

(b)     Buyer shall be entitled to immediate return of all Escrow Amounts (other than as otherwise provided in Section 11.1) , without defense, setoff or recoupment of any kind or nature.

## ARTICLE 12

## MISCELLANEOUS

12.1     Notices.  Any notices or other communications required or permitted hereunder to any party hereto shall be sufficiently given when delivered in person, or when sent by certified or registered mail, postage prepaid, or one business day after dispatch of such notice with an overnight delivery service, or when telecopied if an answer back is received by the sender, in each case addressed as follows:

In the case of Buyer:

TNCI Operating Company LLC
114 E. Haley Street, Suite A
Santa Barbara, CA 93101
Attn: Jeff Compton, President and CEO
Fax: 805-869-1445

With a copy to:

Bingham McCutchen LLP
2020 K Street, N.W., Suite 1100
Washington, DC 20006
Attn: Jean L. Kiddoo
Phone: 202-373-6000
Fax: 202-373-6001

In the case of Seller:

Jackson Walker L.L.P.
100 Congress Avenue, Suite 1100
Austin, TX 78701
Attn: Patricia Baron Tomasco
Phone: 512-236-2076 – direct line
Fax: 512-691-4438 – direct fax

or such substituted address or attention as any party shall have given notice to the others in writing in the manner set forth in this Section 12.1.

12.2     Amendment.  This Agreement may be amended or modified in whole or in part only by an agreement in writing executed by all parties hereto and making specific reference to this Agreement.

12.3     Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which, taken together, shall constitute a

28

single agreement.  It shall not be necessary that all signatures appear on every counterpart so long as each party executes at least one counterpart.  Facsimile and other electronically delivered signatures shall be sufficient and binding for purposes of this Agreement and shall be treated as originals.

12.4  <u>Binding on Successors and Assigns</u>.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the parties hereto and their respective successors and permitted assigns in accordance with the terms hereof.  Sellers may not assign its interest under this Agreement without the prior written consent of Buyer.  Buyer shall have the right to designate any affiliate of Buyer to acquire any of the Assets, but such designation shall not relieve Buyer from the performance of its obligations hereunder.

12.5  <u>Severability</u>.  In the event that any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement and any other application thereof shall not in any way be affected or impaired thereby; provided, however, that to the extent permitted by applicable law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Agreement.

12.6  <u>Publicity</u>.  Any public announcements concerning the transactions contemplated by this Agreement shall be planned and released by Buyer, and Sellers shall not act in this regard without the prior written approval of Buyer, which approval shall not be unreasonably withheld.  This Section shall not impair any regulatory or fiduciary duties of Sellers.

12.7  <u>Headings</u>.  The headings in the sections and subsections of this Agreement and in the Schedules are inserted for convenience only and in no way alter, amend, modify, limit or restrict the contractual obligations of the parties.

12.8  <u>Expenses</u>.  Except to the extent otherwise provided in this Agreement, Sellers and Buyer each shall bear its own expenses incurred in connection with this Agreement and the transactions herein contemplated, including, but not limited to, legal and accounting fees and expenses.

12.9  <u>Waivers</u>.  The parties may, by written agreement, (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations contained in this Agreement or in any document delivered pursuant to this Agreement, (c) waive compliance with, or modify, any of the covenants or conditions contained in this Agreement, and (d) waive or modify performance of any of the obligations of any of the parties hereto; provided, that no such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall operate as a waiver of, or an estoppel with respect to, any subsequent insistence upon such strict compliance other than with respect to the matter so waived or modified.

12.10  <u>Entire Agreement; Law Governing; Submission to Jurisdiction</u>.  All prior negotiations and agreements between the parties hereto are superseded by this Agreement, and

29

there are no representations, warranties, understandings or agreements other than those expressly set forth herein or in a Schedule delivered pursuant hereto, except as modified in writing concurrently herewith or subsequent hereto.  This Agreement shall be governed by and construed and interpreted according to the internal laws of the State of Texas, determined without reference to conflicts of law principles and the Bankruptcy Code.  The Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) shall have exclusive jurisdiction with respect to the interpretation of this Agreement, including without limitation any disputes regarding the computation of amounts due hereunder, and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby, and the parties hereto hereby irrevocably submit to such jurisdiction and irrevocably agree that all claims in respect of any such dispute or proceeding may be heard and determined in such courts.  Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified in Section 12.1 in a manner provided for in Section 12.1.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized representatives on the day and year first above written.

**BUYER**:

TNCI OPERATING COMPANY LLC

By: _____

Printed Name: _____

Its: _____

**SELLERS**:

UPH HOLDINGS, INC.

By: _____

Printed Name: _____

Its: _____

PAC-WEST TELECOMM, INC.

By: _____

Printed Name: _____

Its: _____

TEX-LINK COMMUNICATIONS, INC.

By: _____

Printed Name: _____

Its: _____

UNIPOINT HOLDINGS, INC.

By: _____

Printed Name: _____

Its: _____

UNIPOINT ENHANCED SERVICES, INC.

By: _____

Printed Name: _____

Its: _____

UNIPOINT SERVICES, INC.

By: _____

Printed Name: _____

Its: _____

NWIRE, LLC

By: _____

Printed Name: _____

Its: _____

PEERING PARTNERS COMMUNICATIONS, LLC

By: _____

Printed Name: _____

Its: _____

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**UPH HOLDINGS, INC.,**
**PAC-WEST TELECOMM, INC.,**
**TEX-LINK COMMUNICATIONS, INC.,**
**UNIPOINT HOLDINGS, INC.,**
**UNIPOINT ENHANCED SERVICES, INC.,**
**UNIPOINT SERVICES, INC.,**
**NWIRE, LLC,**
**PEERING PARTNERS COMMUNICATIONS, LLC,**

**AND**

**TNCI OPERATING COMPANY LLC**

**JULY _____, 2013**

# TABLE OF CONTENTS

Page

ARTICLE 1      PURCHASE AND SALE OF ASSETS ............................................................1
    1.1      Description of Assets ....................................................................................1
    1.2      Excluded Assets ....................................................................................3~~4~~
    1.3      Purchase Price ....................................................................................3~~5~~
    1.4      Earnest Money....................................................................................3~~6~~

ARTICLE 2      ASSUMPTION OF LIABILITIES ....................................................3~~7~~
    2.1      Liabilities Assumed ....................................................................................3~~7~~

ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF SELLERS ....................4~~9~~
    3.1      Status ....................................................................................4~~9~~
    3.2      Taxes ....................................................................................6~~10~~
    3.3      Personal Property ~~7~~; Title to Assets ....................................................................................10
    3.4      Intellectual Property Rights ....................................................................................7~~12~~
    3.5      Litigation; Insurance ....................................................................................8~~13~~
    3.6      Accounts Receivable ....................................................................................8~~13~~
    3.7      Financial Statements ....................................................................................8~~14~~
    3.8      Deposits and Prepayments ....................................................................................8~~14~~
    3.9      FCC and ~~Telecommunications~~State PUC Authorizations ....................9~~14~~
    3.10     Leases ....................................................................................9~~15~~
    3.11     Employment Matters; Employee Benefits ....................................................9~~15~~
    3.12     Compliance with Laws ....................................................................................10~~15~~
    3.13     Brokers, Finders, etc. ....................................................................................10~~15~~
    3.14     Books and Records ....................................................................................10~~16~~

ARTICLE 4      REPRESENTATIONS AND WARRANTIES OF BUYER ....................11~~16~~
    4.1      Status of Buyer ....................................................................................11~~16~~
    4.2      Brokers, Finders, etc. ....................................................................................12~~17~~
    4.3      Purchase Price ....................................................................................12~~17~~

ARTICLE 5      CLOSING AND CLOSING DATE ....................................................12~~17~~

ARTICLE 6      COVENANTS OF SELLER ....................................................................12~~22~~
    6.1      Conduct of Business by Seller Pending the Closing ....................12~~22~~
    6.2      Affirmative Covenants ....................................................................................12~~22~~
    6.3      Consents and Closing Conditions ....................................................13~~23~~
    6.4      Bankruptcy Court Approvals ....................................................................13~~23~~

ARTICLE 7      COVENANTS OF BUYER ....................................................................14~~24~~
    7.1      Consents and Closing Conditions ....................................................14~~24~~
    7.2      Access to Records ....................................................................................14~~24~~
    7.3      Claims Retained by Sellers ....................................................................14~~24~~

i

ARTICLE 8          TAX MATTERS .................................................................................... ~~15~~25
     8.1          Cooperation and Records Retention ........................................... ~~15~~25
     8.2          Tax Elections and Permits ........................................................... ~~15~~25
     8.3          Sales and Transfer Taxes ............................................................. ~~15~~25
     8.4          Property Taxes .............................................................................. ~~15~~25

ARTICLE 9          BUYER'S CONDITIONS TO CLOSING ....................................... ~~15~~25
     9.1          ......................................................................................................... ~~15~~25
     9.2          Accuracy of Representations and Warranties ........................... ~~15~~26
     9.3          Performance of Covenants .......................................................... ~~16~~26
     9.4          Closing Documents ....................................................................... ~~16~~26
     9.5          No Changes ................................................................................... ~~16~~26
     9.6          Approval of Bankruptcy Court .................................................. ~~16~~26

ARTICLE 10         SELLER'S CONDITIONS TO CLOSING ..................................... ~~16~~27
     10.1         Accuracy of Representations and Warranties ........................... ~~16~~27
     10.2         Performance of Covenants .......................................................... ~~16~~27
     10.3         Closing Documents ....................................................................... ~~16~~27
     10.4         Approval of Bankruptcy Court .................................................. ~~16~~27

ARTICLE 11        ~~DELIVERIES AT CLOSING~~ ............................................................ ~~16~~
     ~~11.1~~         ~~Deliveries by Sellers~~ ................................................................... ~~16~~
     ~~11.2~~         ~~Deliveries by Buyer~~ ...................................................................... ~~17~~

~~ARTICLE 12~~         TERMINATION OF AGREEMENT ................................................ ~~18~~27
     ~~12.1~~11.1     Termination ................................................................................... ~~18~~27
     ~~12.2~~11.2     Effect of Termination ................................................................... ~~18~~28

ARTICLE ~~13~~12        MISCELLANEOUS ............................................................................ ~~18~~28
     ~~13.1~~12.1     Notices ........................................................................................... ~~18~~28
     ~~13.2~~12.2     Amendment .................................................................................... ~~19~~29
     ~~13.3~~12.3     Counterparts ................................................................................. ~~19~~29
     ~~13.4~~12.4     Binding on Successors and Assigns ........................................... ~~19~~29
     ~~13.5~~12.5     Severability ................................................................................... ~~19~~30
     ~~13.6~~12.6     Publicity ........................................................................................ ~~19~~30
     ~~13.7~~12.7     Headings ........................................................................................ ~~19~~30
     ~~13.8~~12.8     Expenses ........................................................................................ ~~19~~30
     ~~13.9~~12.9     Waivers .......................................................................................... ~~20~~30
     ~~13.10~~12.10   Entire Agreement; Law Governing ............................................. ~~20~~30

**~~EXHIBITS~~ EXHIBITA –MANAGEMENT SERVICES AGREEMENT**

49066/0006-9679207v2

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of the ___ day of ~~——————~~July, 2013 by and ~~between~~ ~~——————————————————, [~~among TNCI Operating Company LLC, a Delaware ~~corporation]~~limited liability company, or its assigns ("*Buyer*"), and UPH Holdings, Inc., a Delaware corporation and debtor-in-possession ("*UPH*") Pac-West Telecomm, Inc., a Delaware corporation and debtor-in-possession  ("*Pac-West*"), UniPoint Holdings, Inc., a Delaware corporation and debtor in possession ("*UniPoint Holdings*"), nWire, LLC, a Texas limited liability company and debtor in possession ("*nWire*"), Peering Partners Communications Holdings, LLC, a Texas limited liability company and debtor in possession ("*Peering Partners*"), UniPoint Services, Inc., a Texas corporation and debtor in possession ("*UniPoint Services*"), UniPoint Enhanced Services, Inc., a Texas corporation and debtor in possession ("*UniPoint Enhanced*"),  and Tex-Link Communications, a Delaware corporation and debtor in possession ("*Tex-Link*"), (collectively, "*Sellers*").

## RECITALS

WHEREAS, Sellers are engaged in the provision of telecommunications and database services (the "*Business*"); and

WHEREAS, on March 28, 2013 (the "*Petition Date*"), Sellers ~~have~~ filed ~~a~~ voluntary petitions for relief commencing cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("*Bankruptcy Court*"); and

WHEREAS, Buyer and Sellers have reached an understanding pursuant to which Buyer shall acquire the Assets (as defined in Section 1.1), which represent substantially all of the assets of the Business other than the Excluded Assets (as defined in Section 1.1), subject to the terms and conditions of this Agreement; and

WHEREAS, each party hereto desires to set forth certain representations and covenants, and to establish certain closing conditions, made to induce the other to execute and deliver this Agreement and to consummate the transactions contemplated hereby, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the premises, the covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1     Description of Assets. ~~At the Closing on the~~On each relevant Closing Date (as each term is defined in Article 5 hereof), subject to the terms and conditions set forth in this Agreement, ~~(a)~~ Sellers shall sell, convey, transfer and assign to Buyer, and Buyer shall purchase and accept from Sellers, ~~the~~any and all right, title and interest in and to all of Seller's tangible and intangible assets of the Business, including but not limited to, those assets set forth below and in Schedule 1.1 (the "*Assets*") ~~and Sellers shall sell to Buyer the Assets but~~; provided, that the Assets will not include the assets ~~set forth~~described in Section 1.2 below (the "*Excluded Assets*"))), free and clear of all ~~liens and encumbrances~~Encumbrances (as defined below), other than liens for the payment of Taxes not yet due or payable, and leases, licenses and other encumbrances set forth on Schedule 1.1 (the "*Permitted Encumbrances*"), and of all interests in property as set forth in Section 363 or other portions of the Bankruptcy Code:

(a)     prepaid expenses, deferred charges, advance payments and security deposits of Sellers that solely relate to the Business;

(b)     all machinery, equipment, vehicles, furniture, fixtures, signs, supplies, accessories, spare parts, tools and other items of tangible personal property owned by Sellers and used solely in the Business, with all assignable executory contracts, licenses, leases, warranty rights and operating manuals and keys relating thereto~~;~~, all as set forth on Schedule 1.1(b);

(c)     except to the extent they fall within the Excluded Assets, Sellers' websites, internet domain names used by the Business, including, to the extent assignable, all rights with respect to internet service providers, third party linking sites and all rights of Seller to owned and/or licensed proprietary, customized and mass market computer software and all computer hardware appropriate for the continued operation of the Business ("*Domain Rights*"), all as set forth on Schedule 1.1(c);

(d)     except to the extent they are Excluded Assets ~~and only to the extent they are used solely in the Business: ~~; all of Sellers' trademarks, service marks, trade dress, trade names and corporate names and signage, and all the goodwill associated therewith; all of Sellers' registered and unregistered statutory and common law copyrights; all registrations, applications, renewals or common law rights for any of the foregoing; all of Sellers' trade secrets, confidential information, ideas, formulas (whether developed or under development), know-how, manufacturing and production processes and techniques, research information, specifications, designs, plans, improvements, proposals, technical and computer data, to the extent transferable, all of Sellers' license rights with respect to intellectual property of third parties; to the extent transferable, all of Sellers' rights under all confidentiality agreements, non-disclosure agreements, invention assignment agreements and similar agreements executed between Sellers and any employee, consultant or agent of Sellers or any other third party with respect to any intellectual property right of Sellers described in this Section 1.1(d) (together with the Domain Rights, the "*Intellectual Property Rights*");

2

(e) subject to Section 2.1, all of Sellers' rights under each of the contracts listed on Schedule 1.1(e), which will be delivered and finalized pursuant to Section 2.1 (the "**Assigned Contracts**"), including any Accounts Receivable and Unbilled Revenue Associated therewith;

(f) all accounts receivable, notes receivableAccounts Receivable, Unbilled Revenue and other receivables of any of the Sellers arising under the Assigned Contracts other than accounts receivable arising prior to, as of the Initial Closing Date and arising on or after the Petition Date, and any Accounts Receivable and Unbilled Revenue generated by Sellers under any Assigned Contract that is an Interconnection Agreement(collectively the "Acquired Accounts Receivable");

(g) all Customer Accounts; provided, however, that the final listing of Customer Accounts and Assigned Contracts with respect to Customer Accounts shall be set forth by Sellers in the appropriate instrument of conveyance delivered at the relevant Closing;

(h) revenue from Sellers' Customer Accounts that accrues after the Initial Closing, subject to and in accordance with the Management Services Agreement;

(i) a list of all Cancelled Accounts, if any;

(j) (g) to the extent used solely in the Business, Sellers' mailing lists, customer lists, brochures and related sales materials and all ad copy, photography and artwork, including materials and documents relating to services, marketing, advertising, promotional activities, trade shows, and all files, supplier lists, records, literature and correspondence (but excluding (i) personnel files for employees of Seller, (ii) such files as may be required to be withheld under applicable law regarding privacy, and (iii) any documents that are not relevant to the Assets), and copies of any and all information and records related to the Customer Accounts that are captured in Sellers' operating support systems in electronic format, and all other documents and materials wherever located that are used in, held for use in or intended to be used in, or that arise out of or relate to, the Business or the Assets;

(k) (h) to the extent assignable, Sellers' telephone numbers (for both voice and data transmission), and used in the Business other than those listed as Excluded Assets;

(l) (i) all records and files pertaining solely to the Business, customers and suppliers, including, without limitation, all supplier, vendor, customer and agency lists, all sales data, correspondence with customers, customer files and account histories, and records of purchases from and correspondence with suppliers, but not including the corporate minute books of Sellers; and

(m) Sellers' Operating Company Numbers, Access Customer Name Abbreviations and Carrier Identification Codes;

(n) to the extent transfer is permitted under the Bankruptcy Code or other applicable law, all permits, licenses, certificates, variances, exemptions, orders, approvals, tariffs, rate schedules and similar documents from any Governmental Body (collectively,

3

"**_Licenses_**") necessary for the lawful ownership of the Assets or other lawful conduct of the business as currently conducted;

(o)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the seller or with third parties to the extent relating to the Assets, including, without limitation, the Customer Accounts, but excluding any employment agreements containing any such agreements;

(p)     all rights, claims, credits, causes of action or rights of set-off against third parties relating to the Assets (including, for the avoidance of doubt, those arising under, or otherwise relating, to the Assigned Contracts), including rights under vendors' and manufacturers' warranties, indemnities and guaranties; provided, however, that nothing in this subsection shall include any claims Sellers may have arising out of or related to any actions commenced by Sellers or any party pursuant to Chapter 5 of the Bankruptcy Code, except for actions arising under section 549 of the Bankruptcy Code with respect to transfers of property that would not otherwise have been Excluded Assets;

(q)     any counterclaims, setoffs or defenses that Sellers may have with respect to any liabilities assumed pursuant to Section 2.1; and

(r)     ~~(i) the~~ Sellers' intangible assets (which may be otherwise described above) used in the operation of the Business, including Sellers' name, and any and all  goodwill of Sellers with respect to the Business, and any owned or licensed software.

Notwithstanding anything hereinabove to the contrary, Sellers shall not be obligated to sell, nor shall Buyer be obligated to purchase, any Asset that, at the Closing, Sellers do not own and have the right to sell under the terms of the Sale Order (as defined in Section 3.1(d)) or otherwise. For purposes of this Agreement, "**_Accounts Receivable_**" shall mean Sellers' gross accounts receivable, notes receivable or other obligations receivable due from third parties, without adjustments for reserves or allowances for doubtful accounts, including, without limitation, CABS receivables arising on or after the Petition Date.  "**_CABS_**" shall mean Sellers' carrier access billing services.  "**_Cancelled Accounts_**" shall mean all cancelled and/or non-active customer accounts that have been terminated within the 12 month period prior to the Initial Closing.  "**_Customer Accounts_**" shall mean the accounts of all of Sellers' active customers and Cancelled Accounts.  "**_Encumbrances_**" shall mean any interest, pledge, lien, mortgage, security interest, judgment, demand, successor liability claim, charge of any kind or nature, tax, assessment, covenant, title defect, encroachment, claim (as and to the full extent that term is defined in Bankruptcy Code Section 101(5) of the Bankruptcy Code), obligation, option or right, whether imposed by agreement, understanding, law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) in or with respect to any assets of Sellers and/or against Sellers, as well as any other interest or burden of any kind.  "**_Unbilled Revenue_**" shall mean the revenue associated with the goods and services provided by Sellers to their customers as of the Initial Closing Date that has not been invoiced or billed to such customers as of the Initial Closing Date.  Unbilled Revenue shall include CABS to the extent arising on or after the Petition Date.

4

1.2    <u>Excluded Assets</u>.  Sellers shall not sell, and Buyer shall not purchase, any of the following assets of Sellers:

(a)    all assets and items listed on Schedule 1.2(a);

(b)    ~~(a)~~ all claims, derivative and non-derivative, against Sellers' current and former officers and directors, as well as any and all claims against Sellers' ~~nsurance~~insurance policies that insure against such claims against the former and current officers and directors and all claims against their former and current auditors, and any right to any proceeds from any such claim, whether from insurance sources or otherwise (collectively, the "***D&O Claims***") and all avoidance and recovery actions under Chapter 5 of the Bankruptcy Code, other than actions arising under section 549 of the Bankruptcy Code with respect to transfers of property that otherwise would not have been Excluded Assets;

(c)    all cash on hand, cash on deposit, checks received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit and marketable securities, including interest accrued thereon, held by or on behalf of the Sellers, but excluding advance payments and security deposits related solely to the Assets as provided in Section 1.1(a) of this Agreement;

(d)    any rights, claims or causes of action of Sellers against third parties relating to the properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than any rights, causes of action or defenses of the Sellers against any third party under any Assigned Contract, except for accounts receivable arising before the Petition Date under any Assigned Contract, which accounts receivable are Excluded Assets under Section 1.1(f) of this Agreement;

(e)    all Accounts Receivable arising before the Petition Date except Accounts Receivable under any Assigned Contract;

(f)    any and all contracts that are not Assigned Contracts ("***Excluded Contracts***") and any and all rights thereunder and prepaid assets related thereto;

(g)    ~~(b)~~any stock or other equity interest in Sellers or other subsidiary of Sellers, and any ~~Telecommunications~~State PUC Authorizations (as defined in Section 3.9) and FCC Authorizations (as defined in Section 3.9) owned or in the name of nWire, ~~LLC; or~~except to the extent that any such State PUC Authorizations and FCC Authorizations are used or useful in the operation Business as currently conducted, in which case such State PUC Authorizations and FCC Authorizations shall instead be deemed Assets assigned to Buyer hereunder to the extent assignable under applicable non-bankruptcy law:

(h)    any and all rights of the Sellers under this Agreement and any other ancillary documents entered in connection herewith, and all consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof and all bank accounts and any right, claims or causes of action of Sellers under this Agreement;

5

(i) (c) all patents and applications, renewals, registrations, and extensions regarding any patents of Sellers, ~~all intellectual property rights of Sellers surrounding those patents, certain IP.v4 address blocks to be designated by Sellers, and the software, copyright, trademade, trade dress and other intellectual property rights surrounding the Telastic™ product and processes~~each as set forth on Schedule 1.2(a) (the "***Excluded Intellectual Property***"), except to the extent that any such Excluded Intellectual Property is used or useful in the operation Business as currently conducted, in which case such Excluded Intellectual Property shall be subject to a perpetual royalty free non-exclusive license from the appropriate Seller to Buyer; ~~and~~

(j) (d) all insurance benefits, including rights and proceeds ~~and~~, insurance premiums, all rights of Sellers relating to claims for refunds, rebates, receivables and rights to offset for any ~~taxes or insurance premiums.~~ Taxes, including without limitation any prepaid Taxes that relate to taxable periods ending on or before the relevant Closing Date, or any other right to payment, settlement or adjustment of the Sellers from any Governmental Body that relate to Assets or periods ending on or before the relevant Closing Date; and

(k) all state certifications, license, registrations or other authorizations held by Sellers in the states listed on Schedule 1.2(a) (the "***Excluded State PUC Authorizations***").

~~1.3     Purchase Price.   The cash consideration to be paid by Buyer at the Closing for the purchase of the Assets will be $_____ plus the Cure Amounts as defined in section 2.1 hereof (the "**Purchase Price**").~~1.3     Purchase Price. The cash consideration to be paid by Buyer at the Closings for the purchase of the Assets will be the sum of $9,750,000 plus the Cure Amounts, as defined in Section 2.1 hereof (such sum is the "***Purchase Price***"). The Purchase Price shall be allocated among asset classes and descriptions as described on Schedule 1.3. The Purchase Price shall be reduced on a dollar-for-dollar basis by (x) the amount by which the Working Capital Amount as of the Initial Closing is less than One Million Dollars ($1,000,000.00) (the "***Working Capital Requirement***"). The "***Working Capital Amount***" is the difference between (x) the Acquired Accounts Receivable, *less* (y) the Assumed Accounts Payable (as defined by Section 2.1). At least two business days prior to the Initial Closing, Sellers shall deliver to Buyer a preliminary schedule of the Working Capital Amount consisting of Assumed Accounts Payable and Acquired Accounts Receivable, and a calculation of the Working Capital Amount. At the Initial Closing, Sellers shall deliver a final schedule of the Working Capital Amount. Within seven (7) business days after the Initial Closing Date, Buyer shall prepare and deliver to Sellers a written statement (the "***Final Working Capital Amount Calculation***") setting forth Buyer's good faith calculation of the Working Capital Amount as of the Initial Closing Date. If the Working Capital Amount is less than the Working Capital Requirement, the Final Working Capital Amount Calculation shall contain a recalculation of the Purchase Price. The Sellers shall have the right to review the books and records of the Business and to discuss with Buyer the preparation of the Final Working Capital Amount Calculation, and any objection to such calculation shall be lodged in writing within three (3) business days after receipt thereof. The Buyer and Sellers will negotiate in good faith to resolve within five (5) business days of delivery of a notice of objection the Final Working Capital Calculation. If they are unable to resolve such objection within such time period, either Buyer or Sellers may file a motion with the Bankruptcy Court to rule on the Final Working Capital Calculation and the Working Capital Amount. If no objection is made within such time period, the Final Working Capital Amount calculation shall become final. Once the Working

6

Capital Amount has been determined in accordance with the foregoing procedures, if the Working Capital Amount is less than the Working Capital Requirement (the "Working Capital Shortfall"), then the Escrow Amount shall be reduced by an amount equal to the Working Capital Shortfall and such amount shall be wire transferred by the Escrow Agent in immediately available funds to such account as Buyer shall designate.

1.4  1.4  Earnest Money.  As a sign of Buyer's sincere interest in closing the transaction transactions contemplated herein, Buyer has submitted will submit a wire transfer to — ———————— as Debtors' Escrow Agent in Comerica Bank, for the account of Unipoint Holdings, Inc., Account No. 1892024330, ABA No. 0121137522, the amount of not less than 5 15% of the Purchase Price (the "***Earnest Money***"). The Earnest Money within one business day following the execution and delivery of this Agreement by the parties hereto. The Earnest Money will then immediately transferred to an account of the third party escrow agent selected by the Buyer and Sellers (the "Escrow Agent") promptly upon the establishment of such account. The Earnest Money and all accrued interest thereon will be credited against the Purchase Price to be paid on the Initial Closing Date.  If this transaction the Initial Closing does not close occur for any reason (other than due to a breach of this Agreement by Buyer, in which case the Earnest Money shall be retained by Seller), the Earnest Money will and all accrued interest thereon shall be promptly returned to Buyer.

## ARTICLE 2

## ASSUMPTION OF LIABILITIES

2.1    Liabilities Assumed.  Buyer shall assume only those Liabilities related to the Business that constitute administrative or priority claims under the Chapter 11 Cases incurred in the ordinary course of Sellers' Business prior to the Closing, all monetary and non-monetary obligations under the Assigned Contracts from and after the Closing, and will assume all post-Petition Date accounts payable that relate to the conduct of the Business or any of the Assigned Contracts (collectively, the "Assumed Accounts Payable").  For the avoidance of doubt, such Assumed Accounts Payable shall not include Seller's legal or other professional fees or expenses or any brokerage or other consultant fees or expenses incurred in connection with the transactions contemplated by this Agreement and shall not include any Taxes or Regulatory Fees arising prior to the Petition Date.  At least ten business days prior to the Initial Closing Date, Sellers shall deliver to Buyer their proposed Schedule 1.1(e) (Assigned Contracts) to this Agreement.  Sellers shall provide appropriate notice to all non-debtor parties to the contracts identified in Schedule 1.1(e) of the possibility that their contracts may be assigned to Buyer, along with the amounts asserted by Sellers as being required to cure any pre-closing monetary default under any such contracts under section 365(b) of the Bankruptcy Code.  Such non-debtor parties shall be provided with an opportunity to object, and any objection that cannot be resolved consensually shall be resolved by the Bankruptcy Court.  At least five business days prior to the Final Closing Date, Buyer shall notify Sellers which contracts on Sellers' proposed Schedule 1.1(e) that Buyer agrees to accept assignment of, and thereafter Sellers shall finalize Schedule 1.1(e).  On or prior to the Final Closing Date, Buyer will execute separate agreements to pay the amounts required to be paid in order to cure any pre-closing monetary default under any Assigned Contract as set forth in required under § 365(b) of the Bankruptcy Code (the "***Cure Amounts***"), and the

7

~~items set forth on Schedule 2.1 hereto~~except, with respect to the Essential Contracts, any amount that exceeds the Cure Cap (as such terms are defined in Section 2.2 hereof), which, pursuant to Section 2.2, shall be the sole responsibility of the Sellers.  Buyer shall pay the Cure Amounts directly to the counterparties to such Assigned Contract as agreed by Buyer and the counterparties. Except for the Assigned Contracts, those items specifically set forth on Schedule 2.1, and the Cure Amounts (all of which Buyer shall assume), Buyer does not, and shall not, assume, and Sellers shall remain liable for, any and all liabilities, obligations, claims and commitments of or against Sellers, whether the same are known or unknown, existing, contingent upon future events or circumstances, accrued, funded, unfunded or otherwise, including without limitation:

(a)      any liabilities or obligations attributable to any claims arising from or relating to injuries to person or property which either occur prior to the Initial Closing Date, or occur after the Initial Closing Date and arise from or relate to any act or omission by Sellers prior to ~~Closing~~the Initial Closing Date (or, in the case of liabilities or obligations attributable to an Assigned Contract occurring prior to the applicable Closing Date for such Assigned Contract, or occurring after the applicable Closing Date with respect to such Assigned Contract and arising from or relating to any act or omission by Sellers prior to such Closing Date);

(b)      any liability or obligation resulting from any formal or informal, written or unwritten agreement of Sellers with respect to severance pay, bonus, pension, health or medical benefit, or any other employee benefit or fringe benefit plan;

(c)      obligations under any collective bargaining agreement covering any employees of Sellers;

(d)      any liability or obligation with respect to any employee, employee benefit or employment obligation of Sellers or the termination thereof, all of which shall be retained as the sole obligation of Sellers; ~~or~~

(e)      any liability or obligation to any Governmental Body arising in connection with the Excluded State PUC Authorizations or any services provided by any Seller thereunder;

(f)      any liability or obligation resulting from any third party claims or judgments relating to Seller practices, billings, and charges prior to the Petition Date; or

(g)      ~~(e)~~  any liability to ~~governmental entities~~Governmental Bodies and/or private persons under any Environmental Laws arising from or related to the operations of Seller, or the condition of the Assets at the time of Closing.  (For purposes of this Agreement, "*Environmental Laws*" means all federal, state or local laws, regulations, statutes, codes, rules, ordinances, resolutions, directives, orders, consent orders or decrees, guidance documents, policy statements, or voluntary cleanup programs of governmental/regulatory agencies, judicial decrees, standards, permits and licenses, or any judicial or administrative interpretation of any of the foregoing, pertaining to the protection of land, water, air, health, or the Environment. "*Environment*" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, groundwater, drinking water supply and ambient air, and also includes indoor air to the extent it is regulated under any Environmental Laws.)

8

2.2     Essential Contracts.  Schedule 2.2 contains a list of contracts that Sellers have identified as "*Essential Contracts*," along with the corresponding Cure Amounts proposed by Sellers for all such contracts (the "*Cure Cap*").  The Essential Contracts are included in the Assigned Contracts, except that, notwithstanding Section 2.1 hereof, the Essential Contracts shall be assumed by Sellers, and assigned to Buyer, as of the Initial Closing Date.  Buyer shall obligated to pay the actual Cure Amount associated with the Essential Contracts in an amount not to exceed the Cure Cap, and Sellers shall be obligated to satisfy any portion of the actual Cure Amount for all Essential Contracts that exceed the Cure Cap  The actual Cure Amount for each Essential Contract shall be determined by agreement of Buyer, Sellers, and the applicable contract counterparty or, if the parties do not agree, then by the Bankruptcy Court, on or before the date of the Sale Hearing.

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyer as follows:

3.1     Status.

(a)     Corporate Existence, Qualification and Power.  Each Seller is a corporation or limited liability company duly incorporated or organized, entitled to conduct business and validly existing under the laws of the state of its incorporation or organization.  Each Seller is qualified to do business as a foreign corporation or limited liability company in such jurisdictions in which it does business.  Sellers have the corporate or limited liability company power to own the assets that they own, lease the assets that they lease and otherwise to conduct the Business as currently conducted.

(b)     Authorization.

(i)     Subject to receipt of the Sale Order (as defined in Section 3.1(d)), Sellers have the right, power and authority to enter into this Agreement and, upon receipt of the Sale Order (as defined in Section 6.4(d)), Sellers will have the right, power and authority to consummate the sale of the Assets owned by them and the other transactions contemplated by, and otherwise to comply with and perform their obligations under this Agreement;

(ii)     Upon receipt of the Sale Order, the execution and, delivery and performance by Sellers of this Agreement will have been duly authorized by all necessary corporate action of Sellers in compliance with governing or applicable agreements, instruments or other documents (including, as applicable, its articles of incorporation, bylaws, certificate of formation or limited liability company or operating agreement (as amended)) and applicable law; and

(iii)     This Agreement constitutes the valid and binding agreement of Sellers, enforceable against Sellers in accordance with its terms, subject to the receipt of the Sale Order.

9

      (c)    <u>Absence of Violations or Conflicts</u>.  Except as disclosed in <u>Schedule 3.1(c)</u> and except to the extent that any restrictions or conditions are invalidated by the Bankruptcy Code and/or the Sale Order, the execution and delivery of this Agreement by Sellers and the consummation by Sellers of the sale of the Assets ~~owned by it~~ and the other transactions contemplated by, or other compliance with or performance under, this Agreement, do not and will not with the passage of time or giving of notice or both, constitute a violation of, be in conflict with, constitute a default or require any payment under, permit a termination of, require any consent under, or result in the creation or imposition of any ~~lien, encumbrance~~<u>Encumbrance</u> or other adverse claim or interest upon any of the Assets under (i) any ~~material~~ contract, agreement or license to which <u>either of</u> Sellers is a party or to which it or any of its respective assets or properties are subject or bound, except for contracts, agreements or licenses requiring consents that have been obtained or will have been obtained as of Closing, (ii) any judgment, decree or order of any ~~governmental authority~~<u>Governmental Body</u> to which Sellers or any of ~~its~~<u>their</u> respective properties are subject or bound, (iii) any applicable law, or (iv) any governing or applicable agreements, instruments or other documents, including, as applicable, articles of incorporation, bylaws, articles of organization or limited liability agreements (as amended).

      <u>(d)</u>    <u>Governmental Permits</u>.  <u>Except as set forth in Schedule 3.1(d) and to the Best of Sellers' Knowledge, as of the date of this Agreement: (i) a list of all of the licenses, certificates, approvals, registrations and other permits and authorizations from a Governmental Body (collectively, "**Governmental Permits**") that are held by Sellers has been provided to Buyer; (ii) Sellers are unaware of any written or threatened in writing notice of cancellation or of default concerning any Governmental Permit used in the operation of Sellers' business; (iii) Sellers are unaware of any written or threatened in writing notice of violation, notice of forfeiture, order to show cause or complaint concerning the suspension or revocation, or notice of apparent liability with respect to any Governmental Permit used in the operation of Sellers' Business; and (iv) Sellers are unaware of any written notice of violation, notice of forfeiture, order to show cause or complaint concerning Sellers' compliance with applicable communications laws.  For purposes of this Agreement, "**Governmental Body**" shall mean any government, quasi-governmental entity or other governmental or regulatory body or agency, whether foreign, federal, state or local, or any agency, instrumentality, court or authority thereof.</u>

      <u>(e)</u>  ~~(d)~~ ~~No Governmental Consents Required~~<u>. </u> ~~Except as set forth in Schedule 3.1(d) or as invalidated by the Bankruptcy Code the Sale Order, no consent, approval~~<u>Consents and Approvals.  To the Best of Sellers' Knowledge, other than (i) obtaining the Sale Order and (ii) or the consents, approvals, and other authorizations of, and the notices and registrations or other filings to, the FCC and State PUCs set forth on Schedule 3.1(e) (respectively the "**FCC Consents**" and "**State PUC Consents**"), no consent, approval</u> order or authorization of, or registration, declaration or filing with, any ~~governmental~~<u>court, regulatory</u> authority ~~on the part of Sellers, or other Governmental Body~~ is required ~~in connection with Sellers'~~<u>for the</u> execution ~~or~~<u>and</u> delivery of this Agreement or the consummation ~~of the sale of the Assets owned~~ by Sellers ~~and~~<u>of</u> the ~~other~~ transactions contemplated by~~, or other compliance with or performance under, this Agreement by Sellers, except for filings with the Bankruptcy Court, including the obtaining of an order authorizing and approving the sale of the Assets pursuant to this Agreement (the "**Sale Order**").~~ <u> this Agreement.  Pursuant to Section 5(b) of the Bid Procedures Order, Sellers have consulted with the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases</u>

10

(the "***Committee***") and with Hercules before selecting Buyer as a Stalking Horse (as such terms are defined in the Motion referred to in the Bid Procedures Order).

    3.2    <u>Taxes and Regulatory Fees</u>.

    (a)    <u>Definitions</u>.  For purposes of this Agreement:

    (i)    The term "***Code***" shall mean the Internal Revenue Code of 1986, as amended.  All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

    (ii)    The term "***Returns***" shall mean, collectively, all reports, declarations, estimates, returns, information statements, and similar documents relating to, or required to be filed in respect of, any Taxes (defined below); and (b) any statements, returns, reports, or similar documents required to be filed pursuant to the Code or pursuant to any income, excise, or other tax provision of federal, territorial, state, local, or foreign law; and the term "***Return***" means any one of the foregoing Returns.

    (iii)    The term "***Taxes***" shall mean (a) all net income, gross income, gross receipts, sales, use, ad valorem, franchise, profits, withholding, employment, payroll, excise, transfer, documentary, mortgage, property, windfall profits, customs, duties, and other taxes, fees, assessments or charges of any kind whatever, together with any interest, penalties and other additions with respect thereto, imposed by any federal, territorial, state, local or foreign government; and (b) any penalties, interest, or other additions to tax for the failure to collect, withhold, or pay over any of the foregoing, or to accurately file any Return; and the term "Tax" shall mean any one of the foregoing Taxes.  Notwithstanding the foregoing, however, when used with reference to a specified person (for example and without limitation, "***Taxes of Sellers***"), the terms "***Taxes***" and "***Tax***" shall include only those amounts for which Buyer or any affiliate thereof is, or could become, liable in whole or part (including, without limitation, any obligation in connection with a duty to collect, withhold, or pay over any Tax, any obligation to contribute to the payment of any Taxes determined on a consolidated, combined, or unitary basis, any liability as a transferee, or any liability as a result of any express or implied obligation to indemnify or pay the Tax obligations of another person or entity) that remains due and payable by the Buyer from and after the entry of the Sale Order.

    (iv)    The term "***Regulatory Fees***" shall mean fees and other contributions required pursuant to state or federal telecommunications laws (including without limitation, state and federal universal service support mechanisms, intrastate or interstate telecommunications relay services, administration of the North American Numbering Plan, shared costs of local number portability administration) and regulatory fees imposed by quasi-governmental or non-governmental entities.

11

(v)   (iv) The term "***Knowledge***" as applied to any party shall mean the actual current knowledge of the current officers and directors of such party.  The term "***Best of Sellers' Knowledge***" shall mean the actual knowledge of the current officers of Sellers, after having made due and diligent inquiry of the records of such party and each other relevant person reasonably believed to have actual knowledge of the matters represented

(b)   Taxes Secured by Assets.  Schedule 3.2(b) sets forth the taxes and claimed taxes that are secured by a first priority lien under applicable non-bankruptcy law.  Notwithstanding any other agreement to the contrary, Sellers will create an "***Ad Valorem Tax Reserve***" in the amount set forth on Schedule 3.2(b) from the Purchase Price with which to pay such taxes as and when such claims and amounts are resolved by final order of the Bankruptcy Court; *provided, however,* that if the Ad Valorem Tax reserve proves, for any reason, to be insufficient to fully satisfy any tax claims secured by any of the Assets, the parties holding such tax claims shall nonetheless have no recourse to Buyer or the Assets, which shall in any event be sold free and clear of any such claims pursuant to section 363(f) of the Bankruptcy Code.

(c)   (b) Returns Filed and Taxes Paid.  Sellers have timely and duly filed or caused to be filed with the appropriate taxing authorities all Returns that it is required to file, except to the extent the filing of such Returns has been extended in accordance with applicable law.  Each such Return, and any amended Return, is correct and complete in all material respects.  All Taxes of Seller due or shown to be due on each such Return, amendment or subsequent assessment with regard thereto, have been timely paid.  To Sellers' Knowledge, there is no valid basis for the assessment of any deficiency with regard to any such Return or amendment.  No other Taxes of Seller are due with respect to any taxable periods or portions of periods ending on or before the Closing Date.  There are no liens, attachments, or similar encumbrances with respect to any Taxes on any of the Assets, other than liens for Taxes of Sellers that are not yet due and payable Regulatory Fees.  Except as set forth in Schedule 3.2, 3.2(c), there are no pending or, to Sellers' Knowledge, threatened audits, investigations, claims, proposals or assessments for or relating to any Taxes Regulatory Fees, whether arising before or after the Petition Date, and there are no matters under discussion with Sellers and any governmental relevant authorities with respect to Taxes Regulatory Fees that could reasonably be expected to result in any additional amount of Taxes. Regulatory Fees for which Buyer would be liable after the Initial Closing Date other than Regulatory Fees that have accrued in connection with revenue received since the Petition Date for which Buyer is liable pursuant to Section 2.1 of this Agreement.

3.3   Personal Property.

3.3   (a) Personal Property; Title to Assets.  For purposes of this Agreement, "***Property***" or "***Properties***" collectively refers to those tangible personal properties of Sellers that are included among the Assets to be sold to Buyer.  Schedule 3.3(a) lists all of the Properties according to the Sellers' books and records with a value of greater than $5,000 used in or necessary for the operation of the Business to which Sellers hold legal or equitable title (whether or not of record), as to which it is taking depreciation. .  With the exception of any dispositions by Sellers in the ordinary course of business (as detailed in a supplemental disclosure schedule to Buyer), Schedule 3.3 remains true, correct and complete as of the date hereof Sellers have good title to all

12

of the Properties owned by it as indicated on Schedule 3.3(a); and (ii) none of the Properties is subject to any lien, claim or other encumbrance  that will not be removed pursuant to the Sale Order except liens for taxes not yet due and payable.  ~~Seller has not conducted a formal inventory of the Properties and does not warrant that each item of Property is still inexistence or in the Sellers' possession.~~Sellers will, upon the entry of the Sale Order and the consummation of the transactions contemplated hereby, transfer, and the Buyer will obtain all right, title and interest in and to, the Assets free and clear of any and all Encumbrances other than the liabilities assumed under Section 2.1.

       3.4    <u>Intellectual Property Rights</u>.

       (a)    <u>Schedule 3.4</u> contains a complete and accurate list of (i) all trade or corporate names used by Sellers in the Business; (ii) all Business-related computer software owned by Seller; (iii) all licenses and other rights granted by Sellers to any third party with respect to Business-related computer software rights; and (iv) all licenses and other rights granted by any third party to Sellers with respect to Business-related computer software rights, together with a description of the subject matter licensed.

       (b)    Except as set forth on <u>Schedule 3.4</u>, (i) one or more of the Sellers are the registered owner, senior or priority user, or otherwise has superior rights in and to, or has valid, enforceable and effective written licenses to use, all of the Intellectual Property Rights listed in <u>Schedule 3.4</u>; (ii) during the two (2) years preceding the date of this Agreement, no claim by any third party contesting the validity, enforceability, use or ownership of any Intellectual Property Rights owned or used by Sellers have been made or, to the Sellers' Knowledge, threatened and no such claim is currently outstanding; (iii) during the two (2) years preceding the date of this Agreement, to Sellers' Knowledge, Sellers have not received any notice of, and is not aware of any facts which indicate a likelihood of, any infringement or misappropriation by any third party with respect to the Intellectual Property Rights of Sellers, nor to Sellers' Knowledge have Sellers received any claim alleging infringement or misappropriation of any Intellectual Property Rights of any third party;~~ and~~ (iv) to Sellers' Knowledge, Sellers have not infringed, misappropriated or otherwise conflicted with any Intellectual Property Rights of any third party, nor are Sellers aware of any infringement, misappropriation or conflict which will occur as a result of the continued operation of the Business as conducted or as currently proposed to be conducted~~.~~; and (v) the Intellectual Property Rights listed in Schedule 3.4 constitute all of the intellectual property rights related to, used or held for use in, necessary to the operation of the Business.

       (c)    To Sellers' Knowledge, neither Sellers nor any employee or agent of Sellers nor any other person or entity, directly or indirectly, (i) has disclosed any of Sellers' trade secrets, formulas, product specifications, manufacturing and production processes and techniques or other confidential information of Sellers (collectively, the "***Information***") to any other person or entity, except in the ordinary course of business (as conducted before, during or after the filing of the ~~Bankruptcy Case~~Chapter 11 Cases) or to the Committee or potential purchasers of the assets of Sellers in connection with such purchasers' due diligence investigation of Sellers in accordance with appropriate confidentiality agreements, or (ii) has used the Information for any purpose other than in connection with the performance of such person's duties to Sellers.  Sellers take reasonable precautions with their employees and others to protect their

13

Intellectual Property Rights and are unaware of any third party with access to Information having used the Information for its own purposes or for any purpose other than in connection with the Business.

3.5    Litigation; Insurance.  Except for the Chapter 11 ~~Case~~Cases and all claims filed against Sellers therein, or as disclosed in Schedule 3.5, Sellers are not (i) engaged in, a party to, subject to or, to the ~~best~~Best of Sellers' Knowledge, threatened with any claim, legal or equitable action, or other proceeding (whether as plaintiff, defendant or otherwise and regardless of the forum or the nature of the opposing party); (ii) to Sellers' Knowledge, subject to any unasserted claim, the assertion of which is likely and which, if asserted, will seek damages, an injunction or other relief against Sellers which claim would have a material adverse effect on the Assets or the operation of the Business; or (iii) a party to or subject to any judgment, order or decree against Sellers or Sellers' assets.  Any claims, litigation or other proceeding listed on Schedule 3.5 and involving injury to persons or property, including any product liability claim, is covered by the insurance described on Schedule 3.5, which description includes a summary of the kind of policy covering such matter and its policy limits.  Except as set forth in Schedule 3.5, there has been no reservation of rights by any insurance carrier, and no such reservation is threatened, concerning the coverage of Sellers with respect to any matter required to be disclosed pursuant to this Section 3.5.

3.6    Accounts Receivable.  ~~Except as set forth in Schedule 3.6, all~~All of Sellers' accounts receivable arising under the Assigned Contracts are valid and enforceable claims (Sellers make no representation or warranty regarding the collectability of any such accounts receivable); the goods and services sold and delivered which gave rise to such accounts were sold and delivered in conformity in all material respects with the applicable purchase orders, agreements and specifications.  ~~To~~From and after the date occurring ninety (90) days prior to the Petition Date, Sellers have made no change in policies or practices with respect to the payment of accounts payable or accrued expenses or the collection of accounts receivable or other receivables, including any acceleration or deferral of the payment or collection thereof, as applicable, in each case, other than in the ordinary course of business.  To the Best of Sellers' Knowledge, there are no rights of set-off or claims against such accounts receivable possessed by the account debtors of Sellers.

3.7    Financial Statements.  Sellers shall furnish to Buyer copies of the reviewed but unaudited consolidated balance sheet of Sellers as of December 31, 2012, and the related consolidated statement of income and retained earnings and statement of cash flows for the period beginning January 1, 2012, and ending on December 31, ~~2012.~~ 2012 (the "**2012 Financial Statements**"), plus monthly financial statements thru May 2013 (the "**2013 Financial Statements**").  Except as set forth in Schedule 3.7, to the Best of Seller's Knowledge, (a) the 2013 Financial Statements present fairly, in all material respects, the financial position of Sellers as of such dates, and the results of operations and cash flows for the periods presented therein.

3.8    Deposits and Prepayments.  Except as set forth in Schedule 3.8, there are no deposits, prepayments for services or other prepaid items of Sellers.

14

3.9 FCC and ~~Telecommunications~~State PUC Authorizations. Schedule ~~3.09(a)~~3.9 sets forth all governmental ~~authorization~~licenses other authorizations (the "*FCC Authorizations*") issued or granted by the Federal Communications Commission ("*~~FCC Authorizations~~*"FCC") held by Sellers, and all governmental ~~authorization~~certificates, licenses, registrations, and other authorizations issued or granted by any of the state public utility commissions, agencies, boards or other similar Governmental Bodies ("*State PUCs*") of the states in which Sellers conduct the Business (the "*~~Telecommunications~~State PUC Authorizations*") held by the Sellers. Except as set forth in Schedule ~~3.09(a),~~3.9, such FCC Authorizations or ~~Telecommunications~~State PUC Authorizations are validly held and in full force and effect, and there is no outstanding notice of cancellation, termination, or non-renewal or, to the Knowledge of Sellers, any threatened cancellation, termination, or non-renewal with respect thereto. None of the Sellers provide material intrastate telecommunications services in any state other than a state where such Seller holds a State PUC Authorization where such authorization is required and no Seller provides any material service pursuant to any Excluded State PUC Authorization where such authorization is required.

(a) Except as set forth in Schedule ~~3.09~~3.9(a), Sellers (i) are not subject to any restrictions or conditions applicable to its FCC Authorizations or ~~Telecommunications~~State PUC Authorizations that materially limit the operations of the Business (other than restrictions or conditions generally applicable to FCC authorizations and ~~telecommunications~~State PUC authorizations of that type); (ii) are not in violation of or noncompliance with the terms and conditions of any such FCC Authorization or ~~Telecommunications~~State PUC Authorization, except for possible violations or noncompliance that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect; and (iii) are not in violation of or noncompliance with any material law applicable to the Business, except for possible violations or noncompliance that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect.

(b) Except as set forth in Schedule ~~3.09~~3.9(b), there are no applications by Sellers, nor, to the Best of Sellers' Knowledge, any complaints or petitions, or other filings by others, or proceedings pending or threatened, before the applicable regulatory authorities relating to Sellers or the FCC Authorizations or ~~Telecommunications~~State PUC Authorizations.

(c) Except as set forth in Schedule ~~3.09~~3.9(c), Sellers have made all reports, and paid all contributions and fees (including with respect to universal service support), required by any law applicable to the Business, except for the failure to file such reports or pay such fees that in the aggregate have not resulted and would not reasonably be expected to result in a material adverse effect.

3.10 Leases. Schedule 3.10 sets forth a true, correct and complete list and description of all leases, subleases, licenses and other occupancy or lease agreements, together with all amendments, supplements and nondisturbance agreements pertaining thereto, under which Sellers lease, sublease, license, occupy or use any real or personal property other than Intellectual Property (the "*Leases*"). Schedule 3.10 also lists the term of such leases, subleases, or licenses, any extension and expansion options, and the rent payable thereunder. To Sellers' Knowledge, as of the date hereof, there are no disputes, oral agreements or forbearance programs in effect as to

15

any of the Leases and Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any leasehold or subleasehold.  Sellers have provided Buyer with true, correct and complete copies of all such Leases.  As of the date hereof, other than the Leases, there are no agreements, contracts and commitments, whether written or oral, by which any of the assets, properties or the Business is bound.

3.11    Employment Matters; Employee Benefits.

(a)    Other than as set forth in Schedule 3.11(a) there are no employment or consulting contracts or arrangements, including pensions, bonus or profit sharing plans, or other severance or termination contracts or arrangements which constitute contractual obligations of Seller.

(b)    Sellers have complied with and shall comply with (to the extent required under the Bankruptcy Code) all of Sellers' obligations with respect to their employees and employment related contracts, including, without limitation, Sellers' Employee Benefit Plans. Buyer shall have no obligations with respect to any of the same.

3.12    Compliance with Laws.  Except as set forth in Schedule 3.12, Sellers have complied with all laws applicable to the Business in all material respects, as presently conducted, including, without limitation, (a) all environmental laws, and (b) all provisions of laws relating to labor relations, equal employment practices, fair employment practices, entitlement, prohibited discrimination, terms and conditions of employment, wages and hours, or other similar employment practices or acts.  Sellers have not received any notice from or otherwise been advised that any ~~governmental authority~~Governmental Body or other person is claiming any violation or potential violation of any law.  ~~Schedule 3.09(a) contains a true, correct and complete list of all permits which Sellers believe is necessary for the lawful and efficient operation of the Business.~~ ~~Other than from the Bankruptcy Court~~Other than with respect to the Chapter 11 Cases, no claim has been made by any ~~governmental authority~~Governmental Body to the effect that the Business, as conducted by Sellers, fail to comply, in any respect (and no such claim is anticipated by Sellers), with any law, rule, regulation, or ordinance.

3.13    Brokers, Finders, etc.  All negotiations relating to this Agreement and the ~~transaction~~transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Sellers in such manner as to give rise to any claim against Buyer for any brokerage or finders' commission or similar compensation.  Other than Q Advisors and each other party set forth on Schedule 3.13, no person or entity is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by Sellers in connection with the transactions contemplated by this Agreement.

3.14    Books and Records.  Sellers have made and kept (and given Buyer access to) ~~the Seller's~~Sellers' book and records, which, in reasonable detail, accurately and fairly reflect the activities and transactions of Sellers, the dispositions of assets related to the Business, and the financial condition of Sellers, including, without limitation, the existence of any and all liabilities, whether actual or contingent.

16

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE IN THIS AGREEMENT, THE ASSETS WILL BE CONVEYED "AS-IS" "WHERE IS" AND WITH ALL FAULTS.  SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ASSETS OR ANY OTHER MATTER EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR TYPE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY SELLER INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

4.1     Status of Buyer.

(a)     Corporate Existence and Status.  Buyer is a [corporation]limited liability company duly organized, entitled to conduct business and validly existing under the laws of the [State of Delaware].

(b)     Authorization.

(i)     Buyer has the right, power and authority to enter into this Agreement and to consummate the purchase of the Assets and the other transactions contemplated by, and otherwise to comply with and perform its obligations under, this Agreement;

(ii)     The execution and delivery by Buyer of this Agreement, and the consummation by Buyer of the purchase of the Assets and the other transactions contemplated by, and other compliance with and performance of its obligations under this Agreement have been duly authorized by all necessary [corporate]limited liability company action on the part of Buyer in compliance with governing or applicable agreements, instruments or other documents (including its [articles of incorporation and bylaws]certificate of formation and operating agreement (as amended)) and applicable law; and

(iii)     This Agreement constitutes the valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

(c)     Absence of Violations or Conflicts.  TheTo Buyer's Knowledge, the execution and delivery of this Agreement and the consummation by Buyer of the purchase of the Assets and the other transactions contemplated by, or other compliance with or performance under, this Agreement do not and will not with the passage of time or giving of notice or both, constitute a violation of, be in conflict with, or require any consent under, (i) any contract, agreement or license to which Buyer is a party or to which it or any of its assets or properties are subject or

17

bound, (ii) any judgment, decree or order of any ~~governmental authority~~Governmental Body to which Buyer or any of its properties are subject or bound, (iii~~) any applicable law, or (iv)~~ any governing or applicable agreements, instruments or other documents, including its **[articles of incorporation and bylaws]**certificate of formation and operating agreement (as amended), or (iv) except with respect to the FCC Consents and the State PUC Consents, any applicable law.

       4.2    ~~(d)  No Governmental Consents Required.  No~~ Consents and Approvals. Except with respect to the obtaining of (a) the Sale Order and (b) the FCC Consents and the State PUC Consents, no consent, approval, order or authorization of, or registration, declaration or filing with, any ~~governmental authority~~Governmental Body on the part of Buyer is required in connection with its execution or delivery of this Agreement or the consummation of the purchase of the Assets and the other transactions contemplated by, or other compliance with or performance under, this Agreement by Buyer~~, except for filings with the Bankruptcy Court, including the obtaining of the Sale Order~~.

       4.3    ~~4.2~~Brokers, Finders, etc.  All negotiations relating to this Agreement and the ~~transaction~~transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Buyer in such manner as to give rise to any claim against Sellers for any brokerage or finders' commission or similar compensation.

       4.4    ~~4.3~~Purchase Price.  Buyer has sufficient cash in immediately available funds to pay the Purchase Price and to consummate the transactions hereunder.

## **ARTICLE 5**

### ~~CLOSING~~CLOSINGS **AND CLOSING** ~~DATE~~DATES

       5.1    The ~~closing~~Closings and the Closing Dates.  The closings of the sale of Assets and other transactions contemplated by this Agreement (the "***Closing***Closings") shall take place at the office of Jackson Walker L.L.P., 100 Congress Avenue, Suite 1100, Austin, Texas 78701, commencing at 9:00 a.m. local time on the ~~date~~dates ("***Closing Date***"~~) that is the later of (a) July 1, 2013, or (b) ten (10) days after satisfaction of all Closing Contingencies and entry of the Sale Order, or such earlier date not prior to the date of entry of the Sale Order as Buyer may select by delivering at least one business days' notice thereof to Sellers.***Dates***"), as follows:

       (a)    Initial Closing.

       (i)    The initial closing (the "***Initial Closing***") shall occur within seven (7) Business Days following the date upon which the conditions to Closing set forth in Article 9 and Article 10 (excepting only the conditions set forth in Section 9.9 (Interim Closing and Final Closing Conditions) shall have been satisfied or waived (the "***Initial Closing Date***"), unless such date is extended by agreement of the parties hereto.

       (ii)    At the Initial Closing:

       (A)    Buyer shall deposit with Escrow Agent the balance of the Purchase Price (together with the Earnest Money and all accrued interest

49066/0006-9679207v2

thereon, collectively, the "*Escrow Amount*") to be released by Escrow Agent to Sellers in installments at the Closings in accordance with the terms of this Agreement;

(B)     Sellers shall sell, and Buyer shall purchase, the Initial Assets, free and clear of all Encumbrances, and Buyer shall assume at the Initial Closing any liabilities contemplated under Section 2.1 except to the extent that any Assigned Contract is not assigned at the Initial Closing;

(C)     Sellers and Buyer shall deliver to the Escrow Agent joint written instruction to transfer to Sellers, by wire transfer of immediately available funds from the Escrow Amount to a bank account designated by Sellers, an amount equal to the sum of the Purchase Price multiplied by the Release Ratio;

(D)     Buyer shall pay any Regulatory Payment then due and payable; and

(E)     The balance of the Escrow Amount shall be retained by the Escrow Agent and applied in accordance with the terms of this Agreement.

For purposes of this Agreement, "*Approved States*" shall mean any and all states of the United States in which the Business is operated and with respect to which (a) either Regulatory Approval has been obtained or no consent, waiver, approval, order, communications license, or authorization of the applicable State PUC is required by applicable State law for the execution or consummation of this Agreement is required, and (b) Buyer has received all licenses and approvals for operation of the Business, if any, required by the applicable State PUC. "*Initial Assets*" shall mean: (a) those Assigned Contracts along with any and all other Assets associated with operations in Approved States, (b) Sellers' Accounts Receivable associated with such operations as of the Initial Closing, and (c) all other Assets that may be transferred to Buyer without Regulatory Approval and that are designated by Buyer for transfer at the Initial Closing.  "*Regulatory Approval*" shall mean any consent, waiver, approval, order, communications license, or authorization of the FCC or any of the State PUCs required by applicable law for the execution or consummation of this Agreement. "*Regulatory Payments*" shall mean any amounts necessary to satisfy any asserted regulatory fees, assessments, fines, penalties or other payments assessed by the FCC, any State PUC, and the Universal Service Administrative Company, based upon Sellers' revenues or Sellers' conduct of the Business or any of the Assigned Contracts first arising prior to the Final Closing Date but after the Petition Date. "*Release Ratio*" shall mean (a) with respect to the Initial Closing, 80% of the Purchase Price and (b) as to the remaining 20% of the Purchase Price or any remaining portion thereof (the "Remaining Purchase Price"), in the case of any Interim Closing, the percentage obtained by dividing (i) the monthly revenue for the full month preceding such Interim Closing, generated by the Assigned Contracts that have not been previously assigned to Buyer for those states as to which Regulatory Approval has been obtained since the Initial Closing or the prior Interim Closing, as the case may be, by (ii) the monthly revenue for the full month preceding such Interim Closing for all of the Assigned Contracts not previously assigned to the Buyer.

19

(b)     Interim Closing(s).   Approximately every forty-five (45) days after the Initial Closing or as otherwise mutually agreed to by the parties (each, an "*Interim Closing*"): (i) Seller shall sell, and Buyer shall purchase, the Assigned Contracts and other Assets for those states that have become Approved States since the last Closing (either Initial or Interim, as applicable), free and clear of all Encumbrances, and Buyer shall assume any liabilities contemplated under Section 2.1 that are associated solely with such Assigned Contracts and Assets; and (ii) the Escrow Agent shall pay to Seller from the Escrow Amount and by wire transfer of immediately available funds to a bank account designated by Seller, an amount equal to the remaining Purchase Price multiplied by the applicable Release Ratio.

(c)     Final Closing.

(i)     The final closing of the transactions contemplated in this Agreement (the "*Final Closing*") shall take place on the earlier to occur of (1) the 180th day following the Initial Closing Date, or (2) the second business day following the date on which all Regulatory Approvals from State PUCs have been obtained by Buyer (the "*Final Closing Date*").

(ii)     At the Final Closing:

(A)     Sellers shall sell, and Buyer shall purchase, the remaining Assets, free and clear of all Encumbrances, and Buyer shall assume any liabilities contemplated under Section 2.1 that are associated with Assigned Contracts assigned at the Final Closing but not previously assumed and assigned; and

(B)     the Escrow Agent shall pay to Sellers, by wire transfer of immediately available funds to a bank account designated by Sellers, the sum of: (1) the balance of the Escrow Amount plus (2) any interest accrued on the foregoing minus (3) any Purchase Price adjustment required under Section 1.3.

(iii)     From and after the Final Closing, Buyer shall be entitled to retain one hundred percent (100%) of net profits for any ongoing operations in states where any Regulatory Approvals have not been obtained as of the Final Closing.

(d)     The Assets shall remain the property of Sellers, and any risk of loss thereof, through the date immediately prior to the respective Closing Date at which such Assets are sold or conveyed to Buyer, and thereafter shall be the property of Buyer with the risk of loss thereof allocated to the Buyer.  Except to the extent otherwise set forth in this Agreement, the liabilities contemplated to be assumed under Section 2.1 that are associated solely with associated with such Assets shall remain the responsibility of Seller through the date immediately prior to the Closing Date at which such liabilities are transferred to Buyer, and thereafter shall be the responsibility of Buyer.

5.2     Conveyances at Closings.

20

(a)    At each Closing, and in connection with effecting and consummating the transactions contemplated hereby, Sellers shall deliver the following to Buyer, if applicable:

(i)    an executed Bill of Sale, in form and substance satisfactory to the Buyer and Sellers, identifying the portion of the Assets being sold, assigned or transferred at such Closing;

(ii)    if applicable, an executed counterpart of an Assumption and Assignment Agreement, in form and substance satisfactory to the Buyer and Sellers, with respect to the Assigned Contracts to be assumed and assigned at such Closing;

(iii)    such other instruments as shall be reasonably requested by Buyer to vest in Buyer title in and to the portion of the Assets being sold, assigned or transferred at such Closing in accordance with the provisions hereof and the Sale Order;

(iv)    at the Initial Closing only:

(A)    an executed escrow release letter directing the Escrow Agent to release the Earnest Money and all accrued interest thereon to Sellers for credit against the portion of the Purchase Price payable on the Initial Closing Date in accordance with Section 1.4 and any additional amounts from the Escrow Amount necessary to pay that portion of the Purchase Price due on the Initial Closing Date; and

(B)    an executed Management Services Agreement in the form attached hereto as Exhibit A (the "*Management Services Agreement*") and an executed Escrow Agreement in form and substance acceptable to Buyer, Sellers and Escrow Agent (the "*Escrow Agreement*").

(v)    at each Interim Closing only, an executed escrow release letter directing the Escrow Agent to release to Sellers the portion of the Escrow Amount payable at each Interim Closing in accordance with Section 5.1(b).

(vi)    at the Final Closing only, an executed escrow release letter directing the Escrow Agent to release the Escrow Amount to Sellers in accordance with Section 5.1(c).

(b)    In connection with effectuating and consummating the transactions contemplated hereby:

(i)    at the Initial Closing only, Buyer shall deliver:

(A)    a certified copy of the Sale Order;

21

(B)     to Sellers an executed Management Services Agreement and an executed Escrow Agreement in form and substance acceptable to Buyer, Sellers and Escrow Agent;

(C)     to Escrow Agent, an executed escrow release letter directing the Escrow Agent to release the Earnest Money and all accrued interest thereon to Sellers for credit against the portion of the Purchase Price payable on the Initial Closing Date in accordance with Section 1.4 and any additional amounts from the Escrow Amount necessary to pay that portion of the Purchase Price due on the Initial Closing Date; and

(D)     to Escrow Agent, the Escrow Amount, by wire transfer of immediately available funds, to be held pursuant to the Escrow Agreement and paid to Sellers in accordance with the terms of this Agreement.

(ii)     at each Interim Closing only, Buyer shall deliver an executed escrow release letter directing the Escrow Agent to release to Sellers the portion of the Escrow Amount payable at each Interim Closing in accordance with Section 5.1(b).

(iii)     at the Final Closing only, Buyer shall deliver to Escrow Agent, an executed escrow release letter directing the Escrow Agent to release to Sellers the Escrow Amount in accordance with Section 5.1(c).

To the extent that a form of any document to be delivered under this Agreement is not attached as an exhibit, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Sellers.

5.3     Other Closing Matters.  Each of the parties shall use their reasonable efforts to take such other actions required hereby to be performed by it prior to or on each Closing Date.

## ARTICLE 6

## COVENANTS OF SELLER

6.1     Conduct of Business by Seller Pending the Closing.  ~~Prior~~At all times prior to the ~~Final~~ Closing Date, Sellers shall conduct the Business in the usual and ordinary course and in accordance with ~~its~~their obligations as ~~a debtor~~debtors-in-possession under the Bankruptcy Code.  Except as otherwise contemplated under this Agreement or ordered by the Bankruptcy Court, from the date hereof until the ~~Final~~ Closing Date, without the prior written consent of Buyer, which consent will not be unreasonably withheld or delayed, ~~Seller~~Sellers shall (x) refrain from selling, assigning, licensing, leasing, transferring or otherwise disposing of, in whole or in part, any of the Assets, except for sales made in the ordinary course of business, and (y) make no change in policies or practices with respect to the payment of accounts payable or accrued expenses or the collection of accounts receivable or other receivables, including any acceleration or deferral of the

22

payment or collection thereof, as applicable, in each case, other than in the ordinary course of business.

6.2     Affirmative Covenants.  Subject to any conflicting obligation imposed on Seller as a debtor-in-possession under the Bankruptcy Code, from the date hereof to the Final Closing Date, Seller shall:

(a)     Use its good faith commercially reasonable efforts to operate the Business in substantially the normalusual and ordinary course of business (and in substantially the same manner as the Business hashad been conducted sinceprior to filing of the Bankruptcy CaseChapter 11 Cases), including normal markdown practices and order fulfillment;

(b)     Undertake to maintain property and liability insurance in appropriate amounts of coverage with respect to the Assets;

(c)     Maintain, consistent with past practice (sinceprior to filing of Sellers' Bankruptcy CaseChapter 11 Cases), the Assets in good repair, order and condition, reasonable wear and tear excepted, and use commercially reasonable efforts to preserve its possession and control of all of the Assets;

(d)     Allow, at all reasonable times up to and including the Final Closing Date, Buyer's employees, attorneys, auditors, accountants and other authorized representatives, reasonable access to the facilities, plants, properties, books, records, documents and correspondence of SellerSellers, in order that Buyer may conduct such investigation as it may desire of the Business; and

(e)     Use commercially reasonable efforts (i) to comply in all material respects with all applicable laws relating to the conduct of the Business, and (ii) to conduct the Business to the Final Closing Date in such a manner that on the Final Closing Date the representations and warranties contained in this Agreement shall be true as though such representations and warranties were made on and as of such date, except for changes permitted or contemplated by the terms of this Agreement.; and

(f)     Sellers shall not change recurring or non-recurring rates or sales strategies or collections processes for the Assets prior to the Initial Closing without the prior written consent of Buyer, in its commercially reasonable discretion.

6.3     Consents and Closing Conditions.     Sellers shall use commercially reasonable efforts to take such actions as may be appropriate in order to fulfill the closing conditions contained herein which are reasonably within their control.

6.4     Bankruptcy Court Approvals.

(c)     (a)  Sale Procedures.  Sellers will file or have filed a motion (the "Sale Motion") with the Bankruptcy Court requesting an order approving of the sale of Assets.  Sellers shall provide Buyer and its counsel with a copy of any subsequent relevant motion or pleading in advance of the date on which the same is to be filed, so that Buyer may comment on such motion or

23

pleading and participate in any related hearings before the Bankruptcy Court. Pleadings. Sellers have previously filed with the Bankruptcy Court a motion [Doc. No. 255] requesting, among other things: (i) an order approving of the Bid Procedures (as hereafter defined), and (ii) ultimately approving the sale of the Assets conducted pursuant to the Bid Procedures (the "***Motion***").  A hearing on the Bid Procedures portion of the Motion was held on June 27, 2013 (the "***Bid Procedures Hearing"*) and a hearing on the Sale Motion is scheduled for July 22, 2013 (the "***Sale Hearing***").

(b)     Court Approval of Sale.  The Sale Motion will request entry of a Sale Order which (i) approves the sale of the Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Sellers to proceed with the transactions contemplated hereunder; (ii) includes a specific finding that Buyer is a good faith purchaser of the Assets; and (iii) states that the sale of the Assets to Buyer shall be free and clear of all interests in the Assets of any entity other than Sellers' estate, including but not limited to all claims, liens and encumbrances of any nature, kind or description. Following the filing of the Sale Motion, Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order.  Upon the Closing, all of the Assets shall be transferred to Buyer, and Buyer shall then take title to the Assets, with such transfer(s) to be made, and title to be taken, free and clear of all claims, liens, mortgages, security interests, charges, encumbrances, taxes, obligations, assessments, covenants, title defects, pledges, encroachments, as well as any other interest or burden of any kind (collectively, "***Claims***"), except for liens for the payment of Taxes not yet due or payable, and leases, licenses and other encumbrances set forth on Schedule 6.4(b) (the "***Permitted Encumbrances***") and any valid Claims to attach to the proceeds. In the event that any of Sellers' creditors or parties-in-interest, including, but not limited to, governmental units, parties to executory and other contracts, equity security holders, administrative expense claimants, and former or current employees (collectively, "***Creditors***") or any other Entity (as that term is defined in the Bankruptcy Code) which has a Claim against or interest in the Assets has not delivered to Sellers documents releasing all such claims or other interests, the Sale Order shall authorize and direct Sellers to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets.    Notwithstanding the provisions of the two immediately preceding sentences, the provisions of the Sale Order authorizing sale of the Assets shall be self-executing, and the failure to execute or file releases, termination statements, assignments, consents, or other instruments shall not affect in any way the clear title acquired by Buyer as set forth in this Section; provided, however, that this paragraph shall not excuse any entity (including, but not limited to, Sellers and creditors) from performing any and all of their respective obligations under the Sale Order, nor shall it prevent the applicable Entities from executing, delivering, and/or filing such implementation documents that Buyer deems to be reasonably necessary or desirable.  Pursuant to the Sale Order, after the Closing Buyer shall not be successor to Sellers, and no successor liability shall attach to Buyer by reason of the purchase of the Assets.  Pursuant to the Sale Order and the related purchase by Buyer, the Assigned Contracts will be assumed by and assigned to Buyer, with Buyer paying Cure Amounts as apart of the Purchase Price.  Sellers may assume, assume and assign, and/or reject any executory contract of Sellers.  Effective on the Closing Date, under the Sale Order, such specified executory contracts to be assumed and assigned to Buyer shall be deemed to be assumed, assigned, and cured in accordance with the provisions of § 365 of the Bankruptcy Code. Both Buyer's and Sellers' obligations to consummate the sale and purchase of the Assets are conditioned upon the Bankruptcy Court's entry of the Sale Order

24

(d)     Bid Procedures.  As used herein, the term "**Bid Procedures**" refers to the bid procedures approved in the Order approving the Bid Procedures [Doc. No. 280] (the "**Bid Procedures Order**").

(i)     Termination Fee.  Consistent with the Bid Procedures Order, the Buyer shall be entitled to a termination fee in the amount of $292,500 (the "**Termination Fee**") upon the occurrence of an Alternative Transaction (as defined in the Bid Procedures Order).  The parties hereto each hereby acknowledge and agree that Buyer has incurred substantial costs and expenses relating to this transaction, including without limitation, the costs and expenses associated with the performance of due diligence of Sellers, the negotiation and execution of this Agreement (and the exhibits and schedules related thereto) and the documents which preceded this Agreement, and has undertaken substantial risk as a result of incurring such costs and expenses.  Consistent with the Bid Procedures Order, the Termination Fee shall be paid without the need for any further Order of the Bankruptcy Court, from the proceeds of the first scheduled closing of any Alternative Transaction and, if applicable, from the proceeds of each subsequent closing until paid in full; *provided, however,* that if the Alternative Transaction is a plan of reorganization, then the Termination Fee shall be paid upon the effective date of such plan.  The procedures applicable to the auction of the Assets (the "**Auction**") shall be as set forth in the Bid Procedures Order.

(ii)     At the Auction, Sellers will take the Termination Fee into account when considering which offer constitutes the highest and best offer for the Assets.  In addition, at the Auction, Sellers will consider the impact upon the estate of contracts assumed by Buyer in determining the highest and best offer.

(e)     Entry of Orders.  The Sale Order shall have been entered by the Bankruptcy Court on or before July 31, 2013.

(f)     Sale Order.  For the purposes of this Agreement, "**Sale Order**" shall refer to an order, in form and substance satisfactory to Buyer in its reasonable discretion, which shall, among other things: (i) find that the Buyer has acted in good faith and is therefore entitled to the protections of Section 363(m) of the Bankruptcy Code; (ii) acknowledge that the sale is a valid exercise of Sellers' business judgment; (iii) authorizing and approving, to the fullest extent permitted under Sections 105, 363(b) and 363(f) of the Bankruptcy Code, the sale of the Assets free and clear of any Encumbrances and declaring that Buyer has no liability and no successor liability with respect to the Assets, other than with respect to the liabilities assumed under Section 2.1, and only to the extent provided in this Agreement; (iv) declaring that, pursuant to Bankruptcy Rules 6006(d) and 6004(g), the Sale Order shall not be stayed but shall be effective immediately; (v) ratifying the sale process and Bid Procedures; (vi) authorizing and approving the assumption and assignment of the Assigned Contracts free and clear of any Encumbrance to the fullest extent permitted under Section 365 of the Bankruptcy Code, except for Buyer's obligations as assignee of Seller under the Assigned Contracts and this Agreement; (vii) approving the Management Services Agreement; and (viii) directing the Sellers to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, evidencing the conveyance of the Assets to Buyer.

25

## ARTICLE 7

## COVENANTS OF BUYER

7.1 <u>Consents and Closing Conditions</u>.  Buyer shall use commercially reasonable efforts to obtain such consents from third parties and to take other actions as may be required in order to fulfill the closing conditions contained herein which are reasonably within its control, and (b including but not limited to (a) within a reasonable time period after Buyer becomes eligible for the Termination Fee, filing for and prosecuting Regulatory Approval before any state or federal agency that does not require the entry of the Sale Order to commence any relevant notice or approval period, (b) within a reasonable time period after entry of the Sale Order, filing for and prosecuting Regulatory Approval with every other state or federal agency in which Regulatory Approval is required; and (c) to cause the representations and warranties of Buyer in <u>Article 4</u> to be true and correct on and as of the each Closing Date.

7.2 <u>Access to Records</u>.  After the Initial Closing Date and upon reasonable prior notice to Buyer, Buyer shall permit Sellers, at Sellers' the Committee or any successor of the Sellers, including without limitation any liquidating trustee or plan administrator appointed under a chapter 11 plan for any or all of the Sellers, at such party's expense during normal business hours, to have reasonable access to such of the former business records of Sellers as are from time to time then retained by Buyer.

7.3 <u>Claims Retained by Sellers</u>.  All claims described in <u>Section 1.2(a)</u> above remain with Sellers, its creditors and shareholders and such claims, if pursued, will be pursued for the exclusive benefit of the creditors of Sellers and the proceeds from the pursuit of any such claim shall be payable to the creditors of Sellers, regardless of who pursues such claims.  Buyer shall have no right to pursue any such claim or to seek any of the proceeds derived therefrom.

## ARTICLE 8

## TAX MATTERS

8.1 <u>Cooperation and Records Retention</u>.  From time to time, Sellers and Buyer shall permit reasonable access, and shall cause their respective accountants and other representatives to permit reasonable access by each other, to the information that they or their accountants or other representatives have within their control and that may be reasonably necessary in connection with the preparation of any Return or the examination by any taxing authority or other administrative or judicial proceeding relating to any Return.  Sellers and Buyer shall retain or cause to be retained, until the applicable statutes of limitations (including any extensions) have expired (or sooner if authorized by an order of the Bankruptcy Court and Sellers first provides Buyer with reasonable notice of the information to be destroyed and a reasonable opportunity to take possession of such information if Buyer so elects), copies of all Returns for all tax periods beginning before the Closing Date, together with supporting work schedules and other records or information that may be relevant to such Returns.

26

8.2     <u>Tax Elections and Permits</u>.  No new elections with respect to Taxes, or any changes in current elections with respect to Taxes, affecting the Assets shall be made by Sellers after the date of this Agreement without the prior written consent of Buyer.

8.3     <u>Sales and Transfer Taxes</u>.  ~~Buyer~~<u>Seller</u> shall bear the responsibility for payment of Taxes in the event that any sales transfer or similar Tax is imposed against Sellers or Buyer as a result of the transactions contemplated hereby.  Sellers shall take any and all actions, at Buyer's expense, and only to the extent that such actions will not have a material adverse impact on Sellers or Sellers' Tax liability, that Buyer may reasonably request in order to minimize Buyer's tax obligations resulting from the transactions contemplated hereby.

8.4     <u>Property Taxes</u>.  Property Taxes on the Assets for calendar year 2013 will be pro-rated between Buyer and Sellers as of the Closing Date.

## <u>ARTICLE 9</u>

## **BUYER'S CONDITIONS TO CLOSING**

The obligation of Buyer to consummate the purchase of the Assets and the other transactions contemplated by this Agreement shall be subject to the fulfillment to Buyer's reasonable satisfaction of each of the following conditions:

9.1     <u>Ordinary Course Operations.</u>  The Business shall have been operated in the ordinary course of business through ~~the~~<u>each</u> Closing, consistent with past practices (as the Business has been conducted ~~since filing the Bankruptcy Case~~<u>prior to filing the Chapter 11 Cases and in accordance with Sellers' obligations under Sections 6.1 and 6.2 hereof</u>), with no increases in compensation and no distributions, dividends or changes in related party transactions.

9.2     <u>Accuracy of Representations and Warranties</u>.  All representations and warranties of Sellers contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects when made, and on and as of ~~the~~<u>each</u> Closing as though made on and as of ~~the~~<u>such</u> Closing, subject to Sellers' right to update and amend the Schedules hereto at any time before Closing <u>with any material changes subject to the prior written consent of Buyer, in its sole discretion</u>.

9.3     <u>Performance of Covenants</u>.  All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Sellers at or before ~~the~~<u>each</u> Closing shall have been duly and properly performed in all material respects.

9.4     <u>Closing Documents</u>.  Sellers shall have delivered all documents required to be delivered by it at Closing, as more specifically set forth in Article ~~11,~~<u>5,</u> in each case in form and substance satisfactory to Buyer.

9.5     <u>No Changes</u>.  There have been no material adverse changes to the Assets, normal wear and tear <u>and insured loss </u>excepted, between the date of this Agreement and the date of <u>the relevant </u>Closing <u>with respect thereto</u>.

27

9.6     Approval of Bankruptcy Court.  The Bankruptcy Court shall have entered the Sale Order.

9.7     Approval of FCC.  The FCC Consents shall have been obtained.

9.8     Regulatory Fees.  The Sale Order shall provide that Buyer will have no liability for any Regulatory Fees arising prior to the Petition Date, including, without limitation, any liability to the Universal Services Administration Company for such fees.

9.9     Interim Closing and Final Closing Conditions.  The obligations of Buyer to consummate the transactions to occur at the Interim Closing(s) and at the Final Closing are subject to the fulfillment, on or prior to the Interim Closing(s) and/or the Final Closing of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable law):

(i)     the State PUC Consents of the states with jurisdiction over the assets being conveyed at the Closing shall have been obtained;

(ii)    the Sale Order shall remain a Final Order; and

(iii)   there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

# ARTICLE 10

## SELLER'S CONDITIONS TO CLOSING

The obligation of Sellers to consummate the sale of the Assets and the other transactions contemplated by this Agreement shall be subject to the fulfillment to Sellers' reasonable satisfaction of each of the following conditions:

10.1     Accuracy of Representations and Warranties.  All representations and warranties of Buyer contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects when made, and on and as of the~~the~~each Closing as though made on and as of ~~the~~such Closing.

10.2     Performance of Covenants.  All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Buyer at or before ~~the~~each Closing shall have been duly and properly performed in all material respects.

10.3     Closing Documents.  Buyer shall have delivered the Purchase Price to ~~Buyer~~Escrow Agent and all documents required to be delivered by it ~~at~~each Closing, as more specifically set forth in Article ~~11~~,5, in each case in form and substance reasonably satisfactory to Sellers.

28

10.4     Approval of Bankruptcy Court.  The Bankruptcy Court shall have entered the Sale Order.

## ARTICLE 11

## DELIVERIES AT CLOSING

11.1     Deliveries by Sellers.  At the Closing, Sellers shall:

(a)     Execute and deliver to Buyer (or its assigns) any and all instruments of sale, assignment and transfer and other documents reasonably requested by Buyer in order to effect the transfer of the Assets to Buyer, or otherwise to facilitate the transactions contemplated hereby, such instruments to include, but not be limited to:

(i)     assignments of patents, trademarks, tradenames, copyrights and all applications and licenses therefore, in form suitable for recording with any applicable registration authority, and all other Intellectual Property Rights of Sellers included in the Assets, including without limitation patent documents, assumed or fictitious names, corporate names, franchises, discoveries and other know-how;

(ii)     duly endorsed certificates of title to vehicles, if any, included within the Assets, together with any appropriate affidavit with respect to the sale price thereof or the odometer reading of such vehicle; and

(iii)     a bill of sale and assignment covering all other Assets of Sellers not identified above, conveying title to such Assets to Buyer, and containing reasonable "further assurances" language obligating Sellers to execute other appropriate instruments after the Closing in order to confirm Buyer's title to and possession of such Assets;

(b)     Deliver to Buyer a "bring-down" certificate executed by an officer of each Seller, and a certificate of incumbency and copy of the resolutions adopted by the Boards of Directors or Board of Managers, as applicable of Sellers, authorizing the execution and delivery of this Agreement and the other transactions contemplated hereby, duly certified as of the Closing Date by an officer of Sellers; and

(c)     To the extent any consents or approvals shall be necessary to any of the transactions herein contemplated, or to the sale of the Assets, Sellers shall deliver to Buyer upon request copies of all such consents or approvals.

11.2     Deliveries by Buyer.  At the Closing, Buyer shall:

(a)     Deliver the Purchase Price;

29

~~(b)      Execute and deliver to Sellers any and all documents identified in Section 11.1(a), if and to the extent appropriate that Buyer execute the same in order to effect the transactions contemplated hereby;~~

~~(c)      Deliver to Sellers a "bring-down" certificate executed by an officer of Buyer, and a certificate of incumbency and copy of the resolutions adopted by Buyer, authorizing the execution and delivery of this Agreement and the other transactions contemplated hereby, duly certified as of the Closing Date by an officer of Buyer;~~

~~(d)      To the extent any consents or approvals shall be necessary to any of the transactions herein contemplated, or to the sale of Assets, Buyer shall deliver to Sellers upon request copies of all such consents or approvals to the extent obtained by Buyer.~~

## ARTICLE 11~~ARTICLE 12~~

### TERMINATION OF AGREEMENT

11.1    ~~12.1~~ Termination.    Anything in this Agreement to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by mutual written consent of Buyer and Sellers (subject to the approval of the Bankruptcy Court) at any time, in which case the Earnest Money and all accrued interest thereon shall be returned to Buyer;

(b)    upon written notice from Buyer to Sellers if ~~any of the conditions precedent to Buyer's obligations hereunder shall have become incapable of fulfillment through no fault of~~ (A) Buyer is not the winning bidder at the Auction, or (B) one or more of the conditions set forth in Article 9 is not satisfied on or before the dates specified in this Agreement for any reason other than a breach of this Agreement by Buyer, including if the Bid Procedures Order is not entered in accordance with the terms of this Agreement, or (C) the Sale Order is not entered by the Bankruptcy Court on or before August 7, 2013, through no fault of Buyer, or (D) the Initial Closing has not occurred on or before November 30, 2013, through no fault of Buyer, and in each such case the Earnest Money and any Escrow Amounts held by the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(c)    upon written notice from Sellers to Buyer if Buyer is not the winning bidder at the Auction, the Earnest Money and any Escrow Amounts previously delivered to the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(d)    ~~(e)~~ upon written notice from Sellers to Buyer if any of the conditions precedent to Sellers' obligations hereunder shall have become incapable of fulfillment through no fault of Seller, the Earnest Money and any Escrow Amounts held by the Escrow Agent, together with any interest thereon shall be returned to Buyer;

(e)    upon written notice from Sellers to Buyer if the aggregate amount of the Cure Amounts for the Essential Contracts are greater than 110% of the Cure Cap. or

30

(f)      (d) upon written notice from either party to the other party hereto if the Initial Closing does not occur by _____,on or before November 30, 2013 (unless the failure to consummate the purchase and sale of the Assets by such date shall be due to the action or failure to act of the party seeking to terminate this Agreement or any affiliate thereof), and if through no fault of Buyer, the Earnest Money and any Escrow Amounts previously delivered to the Escrow Agent, together with any interest thereon shall be returned to Buyer.

11.2    Effect of Termination.  If this Agreement is terminated and the transactions contemplated hereby are abandoned pursuant to Section 11.1, then:

(a)      12.2 Effect of Termination.  If this Agreement is terminated and the transactions contemplated hereby are abandoned pursuant to Section 12.1, then the rights and obligations of the parties hereto under this Agreement shall terminate (other than the provisions of this Section, the provisions related to payment of the Termination Fee and Expense Reimbursement, and the treatment of the Earnest Money), there shall be no liability of any party hereto to any other party hereunder, and the parties shall not be obligated to proceed with the Closing and this Agreement shall be terminated; provided, however, that such termination shall not affect the right of any party to bring an action against another party for a breach occurring prior to the termination or for a wrongful termination; and

(b)      Buyer shall be entitled to immediate return of all Escrow Amounts (other than as otherwise provided in Section 11.1) , without defense, setoff or recoupment of any kind or nature.

## ARTICLE 12ARTICLE 13

## MISCELLANEOUS

12.1    13.1 Notices.  Any notices or other communications required or permitted hereunder to any party hereto shall be sufficiently given when delivered in person, or when sent by certified or registered mail, postage prepaid, or one business day after dispatch of such notice with an overnight delivery service, or when telecopied if an answer back is received by the sender, in each case addressed as follows:

In the case of Buyer:

TNCI Operating Company LLC
114 E. Haley Street, Suite A
Santa Barbara, CA 93101
Attn: Jeff Compton, President and CEO
Fax: 805-869-1445

With a copy to:

Bingham McCutchen LLP
2020 K Street, N.W., Suite 1100

31

Washington, DC 20006
Attn: Jean L. Kiddoo
Phone: 202-373-6000
Fax: 202-373-6001

In the case of Seller:

Jackson Walker L.L.P.
100 Congress Avenue, Suite 1100
Austin, TX 78701
Attn: Patricia Baron Tomasco
Phone: 512-236-2076 – direct line
Fax: 512-691-4438 – direct fax

or such substituted address or attention as any party shall have given notice to the others in writing in the manner set forth in this Section ~~13.1~~12.1.

12.2 ~~13.2~~ Amendment.  This Agreement may be amended or modified in whole or in part only by an agreement in writing executed by all parties hereto and making specific reference to this Agreement.

12.3 ~~13.3~~ Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which, taken together, shall constitute a single agreement.  It shall not be necessary that all signatures appear on every counterpart so long as each party executes at least one counterpart.  ~~Fax~~Facsimile and other electronically delivered signatures shall be sufficient and binding for purposes of this Agreement and shall be treated as originals.

12.4 ~~13.4~~ Binding on Successors and Assigns.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the parties hereto and their respective successors and permitted assigns in accordance with the terms hereof.  Sellers may not assign its interest under this Agreement without the prior written consent of Buyer.  Buyer shall have the right to designate any ~~subsidiary~~affiliate of Buyer to acquire any of the Assets, but such designation shall not relieve Buyer from the performance of its obligations hereunder.

12.5 ~~13.5~~ Severability.  In the event that any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement and any other application thereof shall not in any way be affected or impaired thereby; provided, however, that to the extent permitted by applicable law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Agreement.

12.6 ~~13.6~~ Publicity.  Any public announcements concerning the ~~transaction~~transactions contemplated by this Agreement shall be planned and released by Buyer,

32

and Sellers shall not act in this regard without the prior written approval of Buyer, which approval shall not be unreasonably withheld.  This Section shall not impair any regulatory or fiduciary duties of Sellers.

12.7  13.7 Headings.  The headings in the sections and subsections of this Agreement and in the Schedules are inserted for convenience only and in no way alter, amend, modify, limit or restrict the contractual obligations of the parties.

12.8  13.8 Expenses.  Except to the extent otherwise provided in this Agreement, Sellers and Buyer each shall bear its own expenses incurred in connection with this Agreement and the transactions herein contemplated, including, but not limited to, legal and accounting fees and expenses.

12.9  13.9 Waivers.  The parties may, by written agreement, (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations contained in this Agreement or in any document delivered pursuant to this Agreement, (c) waive compliance with, or modify, any of the covenants or conditions contained in this Agreement, and (d) waive or modify performance of any of the obligations of any of the parties hereto; provided, that no such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall operate as a waiver of, or an estoppel with respect to, any subsequent insistence upon such strict compliance other than with respect to the matter so waived or modified.

12.10  13.10 Entire Agreement; Law Governing; Submission to Jurisdiction.  All prior negotiations and agreements between the parties hereto are superseded by this Agreement, and there are no representations, warranties, understandings or agreements other than those expressly set forth herein or in a Schedule delivered pursuant hereto, except as modified in writing concurrently herewith or subsequent hereto.  This Agreement shall be governed by and construed and interpreted according to the internal laws of the State of Texas, determined without reference to conflicts of law principles and the Bankruptcy Code.  The Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) shall have exclusive jurisdiction with respect to the interpretation of this Agreement, including without limitation any disputes regarding the computation of amounts due hereunder., and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby, and the parties hereto hereby irrevocably submit to such jurisdiction and irrevocably agree that all claims in respect of any such dispute or proceeding may be heard and determined in such courts.  Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified in Section 12.1 in a manner provided for in Section 12.1.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

33

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their duly authorized representatives on the day and year first above written.

**BUYER**:

~~[insert name of Buyer]~~
TNCI OPERATING COMPANY LLC

By: _____

Printed Name: _____

Its: _____

**SELLERS**:

UPH HOLDINGS, INC.

By: _____

Printed Name: _____

Its: _____

PAC-WEST TELECOMM, INC.

By: _____

Printed Name: _____

Its: _____

TEX-LINK COMMUNICATIONS, INC.

By: _____

Printed Name: _____

Its: _____

UNIPOINT HOLDINGS, INC.

By: _____

Printed Name: _____

Its: _____

34

UNIPOINT ENHANCED SERVICES, INC.

By: _____

Printed Name: _____

Its: _____

UNIPOINT SERVICES, INC.

By: _____

Printed Name: _____

Its: _____

NWIRE, LLC

By: _____

Printed Name: _____

Its: _____

PEERING PARTNERS COMMUNICATIONS, LLC

By: _____

Printed Name: _____

Its: _____

35

Schedule 1.1

[FF&E LISTING FROM DATA ROOM TO BE INSERTED HERE]

Schedule 1.1 (d)

(i)  Trade or corporate names used:

| *Name* | *Nature of Business* | *Beginning and ending dates* |
|---|---|---|
| Tex-Link Communications, Inc. | Telecommunication and data services | October 14, 1994 |
| Installnet, Inc. | Telecommunications | January 14, 2000 |
| US Net Solutions, Inc. | Telecommunications | January 21, 2000 |
| Pac-West Telecomm of Virginia, Inc. | Telecommunications | August 17, 2005–present |
| PWT Services, Inc. | Telecommunications | August 26, 2005– present |
| PWT of New York | Telecommunications | August 26, 2005–present |
| Unipoint Enhanced Services, Inc. | Telecommunications | September 5, 2002 |
| UniPoint Services, Inc. | Telecommunications | October 4, 2002–present |
| nWire, LLC | Telecommunications | April 22, 2010–present |
| Peering Partners Communications, LLC | Telecommunications | November 30, 2010–present |
| Pac-West Telecomm, Inc. | Telecommunication and data services | August 27, 1999–present |
| UniPoint Holdings, Inc., d/b/a PointOne | Communications services | January 15, 2002–present |

37

49066/0006-9679207v2

(ii)     Business-Related computer software owned by Sellers **to be listed**.

(iii)    Licenses and other rights granted by Sellers to any third party with respect to Business-related computer software rights **to be listed**.

(iv)     Licenses and other rights granted by any third party to Sellers with respect to business-related computer software rights **to be listed**.

38

Schedule 1.1 (e)
[TO BE COMPLETED BY SELLER/BUYER INPUT ON ASSIGNED CONTRACTS]

Schedule 2.1

(i) Taxes secured by the Assets not yet due and payable

(ii)

Schedule 3.1 (c)

NONE.

41

Schedule 3.1 (d)

NONE.

Schedule 3.2

| Taxing Authority | Consideration for Claim | Amount of Claim |
|---|---|---|
| Aldine ISD Tax Office<br><br>Houston, Texas | Taxes | $4,350.33 |
| City of Houston | Taxes | $99,917.37 |
| City of Los Angeles, Office of Finance | Taxes | $25,000.00 |
| Nelda Wells Spears, Tax Collector, Austin, Texas | Taxes | $5,720.75 |
| State Comptroller of Public Accounts Revenue Accounting Division – Bankruptcy, Austin, Texas | Taxes | $295,308.00 |
| State of Nevada | Taxes | $2,878.14 |

43

Schedule 3.3 (a)

TO BE SUPPLEMENTED WITH FF&E LIST IN DATA ROOM

44

49066/0006-9679207v2

Schedule 3.3 (b)

NONE.

45

Schedule 3.4

(i)      Trade or corporate names used:

| *Name* | *Nature of Business* | *Beginning and ending dates* |
|---|---|---|
| Tex-Link Communications, Inc. | Telecommunication and data services | October 14, 1994 |
| Installnet, Inc. | Telecommunications | January 14, 2000 |
| US Net Solutions, Inc. | Telecommunications | January 21, 2000 |
| Pac-West Telecomm of Virginia, Inc. | Telecommunications | August 17, 2005- present |
| PWT Services, Inc. | Telecommunications | August 26, 2005- present |
| PWT of New York | Telecommunications | August 26, 2005- present |
| Unipoint Enhanced Services, Inc. | Telecommunications | September 5, 2002 |
| UniPoint Services, Inc. | Telecommunications | October 4, 2002- present |
| nWire, LLC | Telecommunications | April 22, 2010- present |
| Peering Partners Communications, LLC | Telecommunications | November 30, 2010- present |
| Pac-West Telecomm, Inc. | Telecommunication and data services | August 27, 1999- present |
| UniPoint Holdings, Inc., d/b/a PointOne | Communications services | January 15, 2002- present |

46

49066/0006-9679207v2

(ii)     Business-Related computer software owned by Sellers to be listed.

(iii)    Licenses and other rights granted by Sellers to any third party with respect to Business-related computer software rights to be listed.

(iv)    Licenses and other rights granted by any third party to Sellers with respect to business-related computer software rights to be listed.

47

Schedule 3.5

| Caption of Suit and Case Number | Nature of Proceeding | Court or Agency and Location | Status of Disposition | Insurance |
|---|---|---|---|---|
| *Pac-West Telecomm* | | | | |
| IBDC vs. Pac-West Telecomm, Inc., Case No. 12-1544-E | Breach of contract | Common Wealth of Massachusetts | Pending | |
| DSET, Inc. v. Pac-West Telecomm, Inc., Case No. 1:11-cv-02041-JOF | Breach of contract | District Court Northern District of Georgia Atlanta Division | Pending | n/a |
| Joe Shields vs. Pac-West Telecom, Inc., et al., Case No. 4:13cv518 | Suit for damages regarding "Robocalls" | U.S. District Court Southern District of Texas | Pending | n/a |
| Data Processing Air Corporation vs Pac-West Telecomm, Inc., Case No. BC496752 | Breach of contract | Superior Court of California County of Los Angeles | Pending | n/a |
| CA Mission Street Limited Partnership vs. Pac-West Telecomm, Inc., et al., Case No. CUD-13-644309 | Unlawful detainer | Superior Court of California County of San Francisco | Pending | n/a |
| Pac-West/Level 3 v. Qwest Corporation, Qwest AZ, Case Nos. T-01051B-05-0495 and T-03693A-05-0495 | Complaint | Arizona Corporation Commission | Pending | n/a |
| Pac-West Telecomm, Inc. v. Qwest Corporation, Qwest-WA, Case No. UT-053036 | Tariff refund | Washington Utilities and Transportation Commission | Pending | n/a |
| Pac-West Telecomm, Inc. Comcast, Case No. | Dispute on charges for termination of | Public Utilities Commission-California | Pending | n/a |

48

| C0709010 | services and findings of violation of PU Code Section 702 | | | |
|---|---|---|---|---|
| **_UniPoint Enhanced Services_** | | | | |
| UniPoint Enhanced Services, Inc. vs. iTalk, Case No. D-1-GN-12-001909 | Breach of contract regarding sales tax | 261st District Court, Travis County, Texas | Pending | n/a |
| **_Peering Partners Communications, LLC_** | | | | |
| Momentum Telecom, Inc. vs. Peering Partners Communications, LLC; UniPoint Holdings, Inc., Case No. A-11-644286-B | Breach of contract regarding transition MOU arising out of acquisition of CommPartners | District Court Clark County, Nevada | Pending | |
| **_UniPoint Services, Inc._** | | | | |
| Global NAPs, Inc. v. Verizon New England, et al; Unipoint Services, Inc; Peering Partners Communications, LLC (Objectors), Case No. 02-cv-12489-RWZ | | U.S. District Court District of Massachusetts | Pending | |
| **_UniPoint Holdings, Inc._** | | | | |
| Aldine Independent School District vs. UniPoint Holdings, Inc., Case No. 2013-06131 | Tax suit | 333rd District Court, Harris County, Texas | Pending | n/a |
| Momentum Telecom, Inc. vs. Peering Partners Communications, LLC; UniPoint Holdings, Inc., Case | *See above* | District Court Clark County, Nevada | Pending | |

49

| No. A-11-644286-B | | | | |
|---|---|---|---|---|
| ZZ Two, Ltd. vs. UniPoint Holdings, Inc., Case No. C-1-CV-13-002378 | Suit for damages to leased facility | County Court, No. 2, Travis County, Texas | Pending | n/a |
| Grande Communications vs. UniPoint Holdings, Inc., Case No. D-1-GN-11-001415 | Breach of contract | 201st District Court, Travis County | Settled but settlement payements not completed | n/a |

50

Schedule 3.6

TO BE COMPLETED BY SELLER FROM DATA IN DATA ROOM.

*Information in Data Room on AR only lists AR Aging; does not include information on AR claims that are not valid and enforceable or setoff rights*

51

Schedule 3.8

NONE.

52

Schedule 3.09 (a)

Pac-West Telecomm, Inc.  CLEC Certifications

| State Name | Certification | |
|---|---|---|
| Alabama | CLEC/IXC | |
| Arizona | CLEC/IXC | |
| California | CLEC/IXC | |
| Colorado | CLEC/IXC | |
| Delaware | CLEC | |
| District of Columbia | Access | |
| Florida | Price List | |
| Georgia | CLEC | Interim for CLEC and Active for IXC |
| Idaho | CLEC/IXC | |
| Illinois | CLEC/IXC | |
| Indiana | CLEC | |
| Kansas | Local | |
| Kentucky | CLEC | |
| Louisiana | CLEC/IXC | |
| Massachusetts | CLEC/IXC | |
| Michigan | VoIP | |
| Minnesota | CLEC | |
| Mississippi | CLEC | |
| Missouri | CLEC/IXC | |
| Nevada | CLEC | |
| New Jersey | CLEC/IXC | |
| New Mexico | CLEC | |
| New York | CLEC/IXC | |
| North Carolina | Price List | |
| Ohio | Access | |
| Oregon | Price List | |
| Pennsylvania | Access | |
| Rhode Island | CLEC | |
| Tennessee | CLEC/IXC | |
| Texas | CLEC | |
| Utah | Price List | |
| Virginia | Access | |
| Washington | Price List | |
| Wisconsin | Access | |

**[SELLERS TO ADD OTHER FCC AND TELECOMMUNICATIONS AUTHORIZATIONS]**

53

Schedule 3.09(b)

NONE.

Schedule 3.09(c)

NONE.

49066/0006-9679207v2

Schedule 3.10

| Seller Party | Other Party | Type of Contract | Description of Services | Date executed | Initial Term | Renewal Term |
|---|---|---|---|---|---|---|
| UniPoint Holdings, Inc. | Switch and Data –AMD1 | Amendment to Master License Agreement dated 1/29/2022 | Colo for Atlanta, New York, Seattle, Miami, Vienna, Chicago, Tampa, Philadelphia, Waltham, Kansas City (MO), St. Louis | 8/29/2003 | | |
| UniPoint Holdings, Inc. | USCOLO | License Agreement | | 1/30/2002 | 36 | |

| Party to Contract | Address | Location of Leased Property | | | | Terms |
|---|---|---|---|---|---|---|
| CBRE | 6500 River Place Blvd., Austin, TX 78730 | 6500 Riverplace Blvd Bldg. 2 Ste. 200 | Austin | TX | 78730 | 5/31/2015 |
| Private Storage Facility | 11320 Hwy 620 North, Austin, TX 78726 | 11320 Hwy 620 North | Austin | TX | 78726 | MTM |
| US Colo | 800 S. Hope Ave. Unit 120 Los Angeles, CA 90017 | 650 S. Grand Ste 1000 | Los Angeles | CA | 90017 | |
| CoreSite CRG West / One Wilshire | 1050 17th Street, Suite 800 Denver, CO 80265 | 624 S. Grand, 4th Floor MMR | Los Angeles | CA | 90017 | MTM |
| Equinix/Switch and Data US | 4252 Solutions Center Chicago, IL 60677 | 56 Marietta St., 6th | Atlanta | GA | 30303 | MTM |
| Equinix/Switch and Data US | 4252 Solutions Center Chicago, IL 60677 | 111 8th Ave., Ste 1533 | New York | NY | 10001 | MTM |
| Equinix/Switch and Data US | 4252 Solutions Center Chicago, IL 60677 | 60 Hudson St., Ste. 1904 | New York | NY | 10013 | MTM |
| Equinix/Switch and Data US | 4252 Solutions Center Chicago, IL 60677 | 104 N. Broad ST., 9th fl, #990 | Philadelphia | PA | 19108 | MTM |
| Equinix/Switch and Data US | 4252 Solutions Center Chicago, IL 60677 | 2323 Bryan. Ste. 1400 | Dallas | TX | 75201 | MTM |
| FPL Fibernet | 9250 West Flagler Street, Miami FL 33174 | 2323 Bryan, Ste. 2323 | Dallas | TX | 75201 | |
| FPL Fibernet | 9250 West Flagler Street, Miami FL 33174 | 323 Broadway St. | San Antonio | TX | 75201 | |
| Level 3 | 1025 Eldorado Blvd., Broomfield CO 80021 | 12001 IH 45 | Houston | TX | 77060 | MTM |

56

49066/0006-9679207v2

| Party to Contract | Address | Location of Leased Property | | | | Terms |
|---|---|---|---|---|---|---|
| Colo Solutions | 100 W. Lucerne Circle, Ste. 201., Orlando FL 32801 | 100 W. Lucerne Cir, Ste 200 | Orlando | FL | 32801 | |
| Equinix/Switch and Data Canada | P.O. Box 7866 Station A., Toronto Ontario M5W 2R2 | 151 Front St. #706 | Toronto | Canada | M5J2 N1 | MTM |
| Lime - Trade (David) | Carrier Services Billing Group P.O. Box 1272 Bridgetown Barbados, WI | Pegwell Exchange, Christ Church | Barbados | | | UNK |
| Lime - Trade (David) | Carrier Services Billing Group P.O. Box 1272 Bridgetown Barbados, WI | 65 Duke St. | Jamaica Kingston | | | UNK |
| Hines REIT One Wilshire, LP | ATTN: Kevin McInerny 624 S. Grand Ave., Suite 2435 Los Angeles, CA 90017 | | Los Angeles | CA | 90017 | |
| Pac-West Stockton HQ Lease | **[TO BE COMPLETED BY SELLERS]** | | Stockton | CA | | |

57

49066/0006-9679207v2

Schedule 3.11 (a)

NONE

49066/0006-9679207v2

Schedule 3.12

NONE

59

Schedule 6.4 (b)

NONE